06-0119-cv
Tabbaa v. Chertoff

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: April 19, 2007                                    Decided: November 26, 2007)

Docket No. 06-0119-cv

_____

SAWSAAN TABBAA, HASSAN SHIBLY, ASMAA ELSHINAWY, KAREMA ATASSI, GALEB RIZEK,
*Plaintiff-Appellants*,

—v.—

MICHAEL CHERTOFF, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ROBERT C. BONNER, COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER
PROTECTION, MICHAEL D'AMBROSIO, UNITED STATES CUSTOMS AND BORDER PROTECTION,
JOSEPH J. WILSON, BUFFALO PORT DIRECTOR FOR THE UNITED STATES CUSTOMS AND BORDER
PROTECTION,
*Defendant-Appellees*.

_____

B e f o r e :

STRAUB, POOLER, and B.D. PARKER, *Circuit Judges*.

_____

Appeal from a final judgment of the United States District Court for the Western District

of New York (William M. Skretny, *Judge*), holding that the United States Bureau of Customs

and Border Protection's searches and detention of plaintiffs at the U.S.-Canada border, upon

plaintiffs' return from an Islamic conference in Toronto, did not violate the Administrative

Procedure Act, the Religious Freedom Restoration Act, or plaintiffs' rights under the First and

Fourth Amendments to the United States Constitution, and granting defendants' motion for

summary judgment.

AFFIRMED.

_____

CHRISTOPHER DUNN, New York Civil Liberties Union Foundation (Corey Stoughton, Udi Ofer, Arthur Eisenberg, New York Civil Liberties Union Foundation, New York, N.Y.; Catherine Kim, American Civil Liberties Union Foundation, New York, N.Y.; Michael Wishnie, New York Civil Liberties Union Foundation cooperating attorney, New York, N.Y.; Arsalan Iftikhar and Khurrum Wahid, Council on American-Islamic Relations, Washington, D.C.; David Jay, Buffalo, N.Y.; Daniel Freeman and Murad Hussain, Allard K. Lowenstein International Human Rights Clinic, National Litigation Project, Yale Law School, New Haven, CT, *on the brief*), New York, N.Y., *for Plaintiffs-Appellants*.

LEWIS S. YELIN, Civil Division, U.S. Department of Justice (Peter D. Keisler, Assistant Attorney General, Washington, D.C.; Terrance P. Flynn, United States Attorney, Western District of New York, Buffalo, N.Y.; Douglas N. Letter, Appellate Litigation Counsel, U.S. Department of Justice, Washington, D.C., *on the brief*), Washington, D.C., *for Defendants-Appellees*.

_____

STRAUB, *Circuit Judge*:

In December 2004, officials at the U.S. Bureau of Customs and Border Protection ("CBP") received intelligence that gave them reason to believe that persons with known terrorist ties would be attending certain Islamic conferences to be held during the year-end holiday season of 2004, including the Reviving the Islamic Spirit Conference at the Skydome in Toronto, Canada. Based on that intelligence, CBP instituted a special inspection operation pursuant to which all individuals who attended these conferences and sought entry into the United States were subject to the kind of screening procedure normally reserved for suspected terrorists. As a result of this policy, plaintiffs – five U.S. citizens and practicing Muslims with no criminal records and of whom the government had no individualized suspicion of being associated with

2

terrorism – were, upon returning from the Skydome conference into the United States, detained by CBP officials for several hours, questioned, patted-down, fingerprinted, and photographed.

Plaintiffs contend that these actions violated the Administrative Procedure Act, the Religious Freedom Restoration Act, their First Amendment rights of association and free expression, and their Fourth Amendment right to be free from unreasonable searches. They initially sought a preliminary injunction preventing the government from instituting a similar policy the following year, as well as expungement of all data received by the government as a result of the searches. The District Court denied this relief and instead granted summary judgment in favor of defendants. *Tabbaa v. Chertoff*, No. 05-CV-582, 2005 WL 3531828 (W.D.N.Y. Dec. 22, 2005). On appeal, plaintiffs no longer demand a preliminary injunction, but they continue to seek expungement, and on that basis ask us to reverse the District Court's grant of summary judgment to defendants.

We affirm the District Court's judgment because (a) CBP had statutory authority for its actions and thus did not violate the Administrative Procedure Act; (b) the searches, which took place at the border, where the government has plenary authority to control entry into the United States, were not so invasive of plaintiffs' privacy as to violate the Fourth Amendment; and, (c) given the intelligence CBP received, the inspection policy was narrowly tailored to achieve the compelling governmental interest in preventing potential terrorists from entering the United States, and thus did not violate the First Amendment or the Religious Freedom Restoration Act.

## BACKGROUND

Because this is an appeal from the District Court's grant of summary judgment for defendants, the following factual recitation resolves all ambiguities and draws all inferences in

3

plaintiffs' favor. *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).

After the passage of the Homeland Security Act of 2002, the agencies principally responsible for policing the U.S. border – the Customs Service, the Border Patrol, and the inspection division of the Immigration and Naturalization Service – were for the first time brought under a single umbrella: the newly-created Department of Homeland Security. *See* Pub. L. No. 107-296 §§ 101, 402, 403, 441, 116 Stat. 2135 (2002) (codified at 6 U.S.C. §§ 111, 202, 203, 251); Reorganization Plan for the Department of Homeland Security, H. Doc. 108-16 (2002) ("Reorganization Plan"), *reprinted in* 6 U.S.C.A. § 542 (2007), at 8, 16. Part of the "primary mission" of the Department of Homeland Security is to "prevent terrorist attacks within the United States" and "reduce the vulnerability of the United States to terrorism." 6 U.S.C. § 111(b)(1). After being consolidated within the Department of Homeland Security, the border agencies, which were renamed the U.S. Bureau of Customs and Border Protection, continued to be responsible for enforcing U.S. immigration laws, administering U.S. customs laws, and "[s]ecuring the borders," but were also given a new principal responsibility: "[p]reventing the entry of terrorists and the instruments of terrorism into the United States." 6 U.S.C. § 202; Reorganization Plan at 16; Reorganization Plan Modification for the Department of Homeland Security, H. Doc. 108-32 (2003) ("Modification Plan") at 4, *reprinted in* 6 U.S.C.A. § 542 (2007).

In December 2004, CBP received intelligence information that raised "specific concerns about certain national and international conferences," including the Reviving the Islamic Spirit Conference ("RIS Conference") that was being held from December 24 through December 26, 2004 at the Skydome in Toronto, Canada. Specifically, CBP had "reason to believe that certain

4

individuals who were associated with terrorist organizations or activities and might pose a danger to the United States, or who were associated with organizations that provide financial support to terrorists, *would be* in attendance at the 2004 RIS conference." CBP also had reason to believe that the 2004 RIS Conference "*would serve* as a possible meeting point for terrorists" to "coordinate operations, and raise funds intended for terrorist activities," as well as "exchange ideas and documents," including "travel or identification documents such as passports or driver's licenses."[1]

Based on this intelligence, in late December 2004, CBP prepared an Intelligence Driven Special Operation ("IDSO"), which directed CBP officials at various ports of entry, including the

---

[1]Plaintiffs selectively cite portions of the record to argue that the evidence, construed most favorably to them, indicates only that the government believed that a person or persons associated with terrorism had attended *prior* Islamic conferences and thus *might* attend one of several such conferences in December 2004, including the RIS Conference. We disagree because none of the passages cited by plaintiffs conflicts with or casts any doubt on the testimony and sworn declaration of CBP official Robert Jacksta, who is the only witness in the record with first-hand knowledge of the intelligence received by the government, and who declared unequivocally that the intelligence gave CBP "reason to believe that the 2004 RIS conference *would serve* as a possible meeting point for terrorists . . . ." (emphasis added). Plaintiffs contend that Jacksta's deposition testimony that "[t]here was no distinction between any conference," means that CBP did not receive intelligence specific to the RIS Conference. But that sentence referred to the scope of CBP's directive to various ports of entry, not to the nature of the intelligence received, and thus does not conflict with Jacksta's repeated statements that CBP received intelligence specific to the 2004 RIS Conference. Plaintiffs' inference is thus unsupported and contradicted by all available indicators. Our obligation to draw all reasonable inferences in favor of plaintiffs does not mean we must credit a version of the facts that is belied by the record. *Scott v. Harris*, --- U.S. ----, 127 S. Ct. 1769, 1776 (2007).

In an abundance of caution, however, we viewed, *ex parte* and *in camera*, the classified intelligence at issue in order to ensure independently that there was a sufficient basis for Jacksta's uncontradicted statements. *Cf. Weberman v. Nat'l Sec. Agency*, 668 F.2d 676, 678 (2d Cir. 1982) (in order to "create[] a more complete record," the court may view "top secret" material *ex parte* and *in camera*). (The District Court was given the option of viewing this classified intelligence, but chose not to do so.) These materials confirmed what the record available to both parties already made plain: CBP had reason to believe that known terrorists, or those with terrorist ties, would be attending the RIS Conference.

one in Buffalo, where plaintiffs entered the United States, to undertake special enforcement actions. The IDSO instructed the officials to: (a) identify and examine all persons associated with any of the Islamic conferences at issue who sought entry into the United States, (b) contact CBP's National Targeting Center upon encountering conference participants "in order to determine whether individuals seeking to enter the United States posed a particular threat," and (c) question conference attendees about their activities during their trip and examine their documentation and persons and vehicles for "evidence of terrorist-related activities, such as plans, money, or even weapons." The IDSO also permitted, but did not require, border officials to fingerprint and photograph conference attendees. The purpose of these measures – which were designed to process travelers who are suspected terrorists – was to "confirm each individual's identity and verify that they were not on any watch list of suspected terrorists, or seeking to use the conference as a cover for crossing the U.S. border, or otherwise involved in illegal activity, or carrying any illegal weapons, documents, monetary instruments, or any other prohibited items across the border." Attendance at one of the Islamic conferences at issue was the sole factor that triggered the enhanced processing.

Plaintiffs – Sawsaan Tabbaa, Hassan Shibly, Asmaa Elshinawy, Karema Atassi, and Galeb Rizek – are U.S. citizens who were among an estimated 13,000 individuals from across North America who attended the RIS Conference. The conference, which lasted three days, included religious and cultural activities, musical performances, a series of prominent Islamic speakers, and communal prayer three times a day. Plaintiffs viewed participation in the conference as an act of religious observance and as a way to learn more about their religion. Tabbaa and Atassi viewed their participation as a "hajj," or pilgrimage; Tabbaa considered

6

attendance to be part of her religious obligations.

Following the conference, plaintiffs reached the U.S. border at various times on December 26 and 27, 2004. Plaintiffs had no criminal records, and at no time did CBP have reasonable suspicion that any particular plaintiff had committed a crime or was associated with terrorists. Yet each experienced similar treatment. Plaintiffs were initially asked where they had been in Canada, and after responding that they had attended an Islamic conference at the Skydome, they were ordered to pull their cars into a separate area and enter a nearby building, where they saw several other people who appeared to be Muslims who also had attended the RIS Conference.

Inside this secondary inspection area, plaintiffs were directed to fill out several forms, and then were questioned about, *inter alia*, their past travels, their relationship to other vehicle occupants, what occurred at the RIS Conference, and why they had attended the conference. Plaintiffs were frisked, fingerprinted, and photographed, and their cars were searched. They were not told why they were being fingerprinted and photographed, or why they had been detained and inspected so thoroughly. Four of the plaintiffs at some point questioned part of the processing, but, after being told that he or she would not be released until all of the screening measures had been completed, eventually complied. Rizek and Shibly assert, and we assume for the purposes of this appeal, that CBP officers forcibly kicked their feet open and almost knocked them on the ground in order to effectuate the pat-downs. We also assume for the purposes of this appeal that, as plaintiffs allege, some physical force – i.e., grabbing of hands – was used to take the fingerprints of Tabbaa, Shibly, and Elshinawy. All told, each plaintiff was detained and searched for between four and six hours, after which he or she was released into the United States.

Within seven days of the searches, the government removed from its databases plaintiffs' fingerprints and photographs. However, the government continues to hold some information about plaintiffs in its Treasury Enforcement Communication System ("TECS"), including each plaintiff's name, date of birth, address, and the details of their 2004 detentions.

Plaintiffs filed the original complaint in this action on April 20, 2005, alleging that CBP's actions violated their rights under the First and Fourth Amendments to the U.S. Constitution and the Religious Freedom Restoration Act ("RFRA"). In July 2005, plaintiffs amended their complaint to include a cause of action under the Administrative Procedure Act ("APA"). The amended complaint sought, *inter alia*, (1) a declaratory judgment that defendants' actions violated plaintiffs' rights; (2) a preliminary and permanent injunction prohibiting defendants from detaining, interrogating, fingerprinting, and photographing U.S. citizens who are Muslims solely because they are returning to the country after having attended Islamic conferences; and (3) an injunction ordering defendants to "return all information, fingerprints, and photographs unlawfully obtained from the plaintiffs and to expunge from government databases or otherwise destroy any information, fingerprints, or photographs that cannot be returned . . . ." Shortly thereafter, plaintiffs moved for the requested preliminary injunction and at the same time defendants moved for summary judgment on all of plaintiffs' claims.

The District Court granted defendants' motion and denied that of plaintiffs. The District Court reasoned that CBP's actions did not violate the Fourth Amendment because the searches were not so invasive as to be beyond the type of "routine" border searches that do not require reasonable suspicion or probable cause. *See Tabbaa*, 2005 WL 3531828, at *9-13. The Court dismissed plaintiffs' First Amendment and RFRA claims because, even though CBP's actions

8

burdened plaintiffs' rights of association and free exercise of religion, the government has a compelling interest in protecting the nation from terrorism, and defendants' actions were narrowly tailored to serve that interest. *Id.* at *14-16. In support of its finding of narrow tailoring, the District Court reasoned that "[t]he government did not target everyone attempting to enter from Canada. It did not target all Muslims. It targeted only those individuals – whether Muslim or not – who the primary inspectors could confirm attended the religious conferences at issue. Moreover, the IDSO limited the inspection techniques to routine searches, as opposed to implementing more invasive measures." *Id.* at *15. Finally, the District Court found that CBP was acting within its authority under the Administrative Procedure Act because the searches were "entirely consistent with the CBP's statutory mandate to 'prevent[] the entry of terrorists and the instruments of terrorism into the United States.'" *Id.* at *16.

Plaintiffs have not appealed the District Court's denial of preliminary and permanent injunctive relief enjoining CBP from instituting similar search policies in the future. Rather, in appealing the District Court's grant of summary judgment, plaintiffs seek only declaratory relief and expungement of the data collected by defendants during the December 2004 searches of plaintiffs.

**DISCUSSION**

**I. Plaintiffs Have Not Abandoned Their Demand for Relief**

As a threshold issue, defendants contend that plaintiffs abandoned their sole remaining demand other than declaratory relief – expungement – by not arguing in their opening brief that they were entitled to expungement. This argument fails because plaintiffs have consistently sought expungement throughout this litigation, the District Court specifically found that

expungement was a live demand and that plaintiffs possessed standing to pursue that demand, and plaintiffs' opening brief complies with Rule 28(a)(10) of the Federal Rules of Appellate Procedure, which requires only that an appellant's brief contain "a short conclusion stating the precise relief sought." Fed. R. App. P. 28(a)(10). Plaintiffs' opening brief requests that this Court "reverse the District Court ruling granting summary judgment to the defendants." This request incorporates the demand for expungement that plaintiffs made below because a reversal of the grant of summary judgment would necessarily revive that demand. Nothing more is required.[2]

## II. Defendants Did Not Violate the Administrative Procedure Act

Plaintiffs' first substantive claim is brought pursuant to the APA. Plaintiffs argue that CBP did not have statutory authority to detain them in order to screen for possible association with terrorist activity, in violation of section 706 of the APA. *See* 5 U.S.C. § 706(2)(c) (providing that a reviewing court shall set aside agency action "found to be . . . in excess of statutory jurisdiction, authority, or limitations . . . ."). Plaintiffs do not contest that CBP, as a general matter, can implement any of the screening procedures to which plaintiffs were subject, including detailed questioning, fingerprinting, and photographing. Indeed, it is undisputed that all persons seeking entry into the United States are subject to search and detention by CBP officers, and that CBP, as a matter of standard operating procedure, may refer individuals for a secondary inspection that can include the collection of biometric information such as fingerprints

---

[2]Defendants properly do not contest that plaintiffs possess Article III standing based on their demand for expungement. *See Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 (D.C. Cir. 2004); *cf. Bradley v. Coughlin*, 671 F.2d 686, 690 n.9 (2d Cir. 1982) (recognizing expungement of records as a valid equitable demand).

or photographs.

Rather, plaintiffs argue that CBP acted beyond the scope of its authority because the *purpose* of the searches and detention of plaintiffs was not to ensure that they were U.S. citizens or were carrying unlawful goods into the United States, but rather to examine whether they were or had been associated with terrorism-related activities. Under plaintiffs' theory, CBP can only detain persons at the border (a) to verify U.S. citizenship or lawful immigration status, (b) to search for contraband or dutiable goods, or (c) upon reasonable suspicion of criminal activity. Thus, according to plaintiffs, once CBP had determined that they were U.S. citizens – a straightforward task, given that four of the plaintiffs were carrying valid U.S. passports and the fifth a valid driver's license – and also that they were not carrying contraband or dutiable goods, CBP had no further power to detain plaintiffs absent reasonable suspicion that they had committed a crime.

The customs statutes and regulations, however, do not so confine CBP's authority to detain and search individuals, especially in the wake of the creation of the Department of Homeland Security. A crucial aspect of the new "primary mission" of CBP is to "prevent terrorist attacks within the United States" and "reduce the vulnerability of the United States to terrorism." 6 U.S.C. § 111(b)(1). The undersecretary in charge of CBP has specific statutory responsibility for "[p]reventing the entry of terrorists and the instruments of terrorism into the United States." 6 U.S.C. § 202(1). Given these provisions, we cannot conclude that it is beyond the power of CBP to search and detain an individual for the limited purpose of determining whether he or she is or has been associated with known terrorists, so long as CBP is not violating the individual's other constitutional or statutory rights. Indeed, the customs laws provide

sufficient authority for CBP to conduct the type of searches at issue here.  *Cf.* 19 U.S.C. § 1582 ("[A]ll persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under [CBP regulations]."); 19 U.S.C. § 1433(e) (providing that after arriving in the United States, a vehicle may "depart from the . . . place . . . of arrival; or discharge any passenger" only "in accordance with regulations prescribed by the Secretary [of Homeland Security]"); 8 U.S.C. § 1225(b) (providing that an alien "shall be detained" unless he or she appears to the examining immigration officer to be "clearly and beyond a doubt entitled" to enter).  Accordingly, the District Court was correct to conclude that the searches and detentions of plaintiffs were "entirely consistent with the CBP's statutory mandate . . . ." *Tabbaa*, 2005 WL 3531828, at *16.

**III. The Searches and Detention of Plaintiffs Did Not Violate the Fourth Amendment**

Plaintiffs' second claim is that CBP's searches were unreasonable in violation of the Fourth Amendment to the U.S. Constitution.

It is well established that the government has broad powers to conduct searches at the border even where, as here, there is no reasonable suspicion that the prospective entrant has committed a crime.  *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("Congress, since the beginning of our Government, has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant . . . .") (internal quotation marks omitted); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ."); *United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("[S]earches made at the border, pursuant to the longstanding right of

12

the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border . . . ."); *United States v. Nieves*, 609 F.2d 642, 645 (2d Cir. 1979) ("It long has been established that routine border searches, conducted for the purpose of controlling the movement of people and goods across our national boundaries, do not violate the Fourth Amendment's prohibition against unreasonable searches."). Accordingly, a suspicionless search at the border is permissible under the Fourth Amendment so long as it is considered to be "routine." *See, e.g.*, *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The precise line between what is routine and what is not routine, however, has not been clearly delineated. On the one hand, it has been held that "[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Id.* (citing *United States v. Grotke*, 702 F.2d 49, 51-52 (2d Cir. 1983)). By contrast, "more invasive searches, like strip searches, require reasonable suspicion." *Id.* The Supreme Court has stated that "non-routine" searches include "strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez*, 473 U.S. at 541 n.4. The determining factor is not how ordinary or commonplace a search is, but rather "the level of intrusion into a person's privacy." *Irving*, 452 F.3d at 123.

There is, of course, a good deal of distance between strip and body cavity searches near one end of the spectrum and a search of pockets or outer clothing near the other, and the searches at issue here fall somewhere in the middle. Plaintiffs argue that the terrorist-style processing they were forced to experience, which was more rigorous than many of the secondary inspections given to people who arouse suspicion when attempting to the enter the United States, went far

13

beyond what one would expect to undergo at the border and thus cannot be considered routine. Defendants respond that the searches were no more intrusive than the types of pat-downs that we have in the past held to be routine.

Plaintiffs focus on three aspects of the searches in question, which we address in turn. First, plaintiffs urge us to find that their treatment, when considered in its entirety, was not routine because of the combined effect of the various measures employed, including intrusive questioning, photographing, and fingerprinting. We are sympathetic to plaintiffs' argument because there arguably was a stigma associated with being subject to the IDSO procedures. In *MacWade v. Kelly*, 460 F.3d 260, 273 (2d Cir. 2006), we found that police searches of subway passengers' bags were "minimally intrusive" in part because the searches were conducted "out in the open, which reduces the fear and stigma that removal to a hidden area can cause . . . ." Here, plaintiffs were gathered into a separate building along with several other Muslims who had attended the RIS Conference – and all of these attendees were subject to a form of border processing normally reserved for suspected terrorists. As a result, it is not unreasonable for plaintiffs to have felt there was a stigma attached to the searches. *Cf. United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) ("The search of carry-on baggage, *applied to everyone*, involves not the slightest stigma. More than a million Americans subject themselves to it daily . . . .") (emphasis added and citation omitted).

On the other hand, none of the specific measures taken by CBP was more invasive than the types of searches at the border that courts have regularly held to be routine. Plaintiffs complain that they were required to answer intrusive questions about their activities at the conference, the content of the lectures they attended, and their reasons for attending. But these

14

questions are not materially different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip. *See United States v. Silva*, 715 F.2d 43, 47 (2d Cir. 1983) (noting that questions about "citizenship, the length and purpose of [an applicant's] trip to Canada, [and] what items she had acquired or bought in Canada" are all routine). Likewise, pat-down searches have repeatedly been found to be routine, even when they were followed by the lifting of an applicant's shirt or the forced removal of shoes. *See, e.g.*, *United States v. Charleus*, 871 F.2d 265, 268 (2d Cir. 1989) (While "[t]he light touching of appellant's back followed by a lifting of his shirt arguably straddles the line between the two categories of border searches," it can be considered a routine search because "the potential indignity . . . . fail[ed] to compare with the much greater level of intrusion associated with a body cavity or full strip search . . . ."). The forcing open of plaintiffs' feet that we assume to have occurred here in at least two instances, while perhaps marginally more invasive than the lifting of a shirt, is not so invasive of plaintiffs' privacy as to be distinguishable from our holdings that pat-down searches are routine.

We also conclude that the fingerprinting and photographing of plaintiffs does not take the searches out of the realm of what is considered routine because, at least in the context of a border search, being fingerprinted (even forcibly) and photographed is not particularly invasive, especially considering that the photographs and fingerprints were used solely to verify plaintiffs' identities and then were discarded from the government's databases. *See Davis v. Mississippi*, 394 U.S. 721, 727 (1969) ("Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."); *Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005) (noting that the Supreme Court has suggested that fingerprinting is not

15

entitled to Fourth Amendment protection and describing fingerprinting as a "non-intrusive means of obtaining physical evidence . . .."); *Montoya de Hernandez*, 473 U.S. at 539-40 ("[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.") (internal citation omitted).

Thus, each of the individual elements of the searches was routine. And while we leave open the possibility that in some circumstances the cumulative effect of several routine search methods could render an overall search non-routine, we do not find that to be the case here. While plaintiffs were undoubtedly made uncomfortable and angry by the searches, and they may understandably have felt stigmatized, their personal privacy was not invaded in the same way as it would have been had they been subject to a body cavity or strip search, or involuntary x-ray. Because the decisive factor in the analysis is invasiveness of privacy – not overall inconvenience – we find that CBP's searches of plaintiffs, considered in their entirety, were routine in the border context, albeit near the outer limits of what is permissible absent reasonable suspicion.

Plaintiffs' second argument is that the searches were not routine because CBP agents threatened to detain plaintiffs until they cooperated. We have not previously considered whether a threat of continued detention can turn an otherwise routine search into one requiring reasonable suspicion. However, as noted above, CBP has clear statutory authority to detain persons at the border in order to, *inter alia*, confirm their citizenship or ensure that they are not bringing illicit goods into the country. *See, e.g.*, 19 U.S.C. § 1582; 19 U.S.C. § 1433(e); 8 U.S.C. § 1225(b). Thus, it would no doubt be considered routine for customs officials to continue to detain prospective entrants if, for example, they did not willingly turn over their passports or permit

16

their vehicles to be searched. It is, quite reasonably, not the practice of CBP to allow prospective entrants who fail to comply with inspection to freely leave the checkpoint, as that would enable smugglers, terrorists, and others not entitled to enter the country to continuously try other checkpoints until they find one that provides a less rigorous screening. Thus, CBP's ability to threaten with extended detention those who do not comply with lawful screening measures is an important aspect of the "longstanding right of the sovereign to protect itself" at the border, and therefore is "reasonable simply by virtue of the fact that [it] occur[s] at the border . . . ." *Ramsey*, 431 U.S. at 616. In other words, border crossers cannot, by their own non-compliance, turn an otherwise routine search into a non-routine one.

Finally, plaintiffs argue that the duration of their detentions – between four and six hours – cannot be considered routine because U.S. citizens do not expect to be held at the border for that length of time. Plaintiffs rely on *United States v. Montoya de Hernandez*, in which the Supreme Court treated as non-routine the 16-hour detention of a woman whom customs officials suspected of smuggling drugs via her alimentary canal. 473 U.S. at 535, 540. Defendants, on the other hand, cite *United States v. Flores-Montano*, in which the Supreme Court held that a one-hour delay incident to a border search did not render that search non-routine because "[w]e think it clear that delays of one to two hours at international borders are to be expected." 541 U.S. at 155 n.3.

While the searches here fall between these two poles, we believe they are more akin to the one-hour delay in *Flores-Montano* than the overnight detention in *Montoya de Hernandez*. The Supreme Court noted in *Flores-Montano* that "no cases indicat[e] [that] the Fourth Amendment shields entrants from inconvenience or delay at the international border." 541 U.S.

17

at 155 n.3. Moreover, the Supreme Court has "consistently rejected hard-and-fast time limits" in evaluating the reasonableness of border searches and has stressed that "'common sense and ordinary human experience must govern over rigid criteria.'" *Montoya de Hernandez*, 473 U.S. at 543 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (observing that there are no rigid time limits on Terry stops)). In other words, we must consider "whether the detention of [the traveler] was reasonably related in scope to the circumstances which justified it initially." *Id.* at 542.

While a delay of four, five, or six hours is obviously of more serious magnitude than a delay of "one to two hours," "common sense and ordinary human experience" suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine. The additional four hours, while certainly inconvenient, thus cannot be considered an unexpected "level of intrusion into a person's privacy," *Irving*, 452 F.3d at 123, that by itself would render the searches non-routine.[3] Accordingly, the searches and detention of plaintiffs were routine in the border context and thus did not violate the Fourth Amendment.

---

[3]We disagree, however, with the District Court's conclusion that the four-to-six hour delays were routine because they were due to "a confluence of unanticipated circumstances – the time of day, reduced CBP staffing, an unexpected influx of conference attendees, and, to some degree, Plaintiffs' refusal to cooperate with the searches." *Tabbaa*, 2005 WL 3531828, at *11. Given the nature of the IDSO, CBP should have anticipated the need for additional staffing in the days after the RIS Conference – and, even though 13,000 people attended, CBP conducted detailed inspections of only 34 attendees, a number that surely cannot be considered "an unexpected influx." There is also a dispute in the record as to whether plaintiffs ever refused to cooperate with the searches, so any purported lack of cooperation should not have been a factor in the District Court's analysis.

18

**IV. Defendants' Actions Did Not Violate Plaintiffs' Right of Association**

Plaintiffs next argue that the searches and detentions violated their First Amendment right of freedom of expressive association. Plaintiffs unquestionably had a protected right to express themselves through association at the RIS Conference. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court observed in *Roberts*, the right of expressive association "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.* Participation in the RIS Conference – a social, religious, and cultural gathering – falls squarely within the forms of associational activity protected by the First Amendment.

The first question we must answer, then, is whether and to what extent defendants' actions burdened that right. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657-59 (2000); *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996). Mere incidental burdens on the right to associate do not violate the First Amendment; rather, "[t]o be cognizable, the interference with [plaintiffs'] associational rights must be "direct and substantial" or "significant." *Fighting Finest, Inc.*, 95 F.3d at 228 (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 & n.5 (1988)).

Defendants assert that their actions only incidentally interfered with plaintiffs' associational rights, if at all, because (1) CBP did not order plaintiffs to refrain from associating with others at the RIS Conference, nor did it prevent plaintiffs from doing so; and (2) plaintiffs have not established that their ability to associate was "chilled" by the inspections because some of the plaintiffs have expressed a willingness to go to future RIS conferences.

19

We disagree. Government action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity. For example, when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect. *See Healy v. James*, 408 U.S. 169, 181-84 (1972). In *Healy v. James*, the Supreme Court, emphasizing that "the Constitution's protection is not limited to direct interference with fundamental rights[,]" held that a college's denial of official recognition to a student organization constituted a substantial burden on association. *Id.* at 183. It did not matter that the plaintiffs in *Healy* had not demonstrated a chilling effect on their desire or ability to associate in the future, or that they could freely hold their meetings and distribute their materials off campus; rather, there was a substantial burden because of the significant "disabilities imposed" by the defendant's actions. *Id.*

Here, plaintiffs suffered a significant penalty, or disability, solely by virtue of associating at the RIS Conference: they were detained for a lengthy period of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure these measures. Moreover, even though some of the plaintiffs expressed a willingness to attend future RIS conferences, the prospect of being singled out for such extensive processing could reasonably deter others from associating at similar conferences. *Cf. Lyng*, 485 U.S. at 367 (concluding that a burden is merely incidental when it is "exceedingly unlikely" that a defendant's actions would prevent someone from exercising his or her associational rights) (internal quotation marks omitted). And contrary to the government's contention, the burden on

20

plaintiffs was no less simply by virtue of the fact that they were not aware of the IDSO prior to going to the conference and therefore were not deterred from attending; First Amendment rights do not turn on whether their potential infringement came as a surprise. Thus, we find that the burden on plaintiffs' associational rights was sufficiently "significant" to implicate the protections of the First Amendment.[4] *See Fighting Finest, Inc.*, 95 F.3d at 228.

Having found a cognizable burden, we must next determine the appropriate level of scrutiny to employ in evaluating defendants' actions. The District Court applied the test established in *Roberts v. United States Jaycees*: an infringement on associational rights is not unconstitutional so long as it "serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." 468 U.S. at 623. Courts have regularly applied this test when evaluating associational claims, *see, e.g.*, *Dale*, 530 U.S. at 648; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-63 (7th Cir. 2006); *Heartland Acad. Cmty Church v. Waddle*, 427 F.3d 525, 535 (8th Cir. 2005), and we believe this test to be appropriate here.[5]

---

[4]Our conclusion that the searches constituted a significant or substantial burden on plaintiffs' First Amendment associational rights is unaltered by our holding that the searches were routine under the Fourth Amendment. As is clear from the above discussion, distinguishing between incidental and substantial burdens under the First Amendment requires a different analysis, applying different legal standards, than distinguishing what is and is not routine in the Fourth Amendment border context.

[5]The author of this opinion, speaking for himself, does note, however, that because the infringement on association here occurred as part of a border search, a less rigorous form of scrutiny could potentially be warranted. The Supreme Court has pointed out on several occasions that "searches of persons or packages at the national border rest on different considerations and different rules of constitutional law from domestic regulations." *Montoya de Hernandez*, 473 U.S. at 537 (quoting *Ramsey*, 431 U.S. at 618-619); *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 125 (1973). As the opinion has already explained, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international

It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest unrelated to the suppression of ideas, and that the IDSO was instituted to serve this compelling state interest. The only question, therefore, is whether this interest could have been "achieved through means significantly less restrictive of [plaintiffs'] associational freedoms." *Roberts*, 468 U.S. at 623.

The government has established that it could not have been. As the District Court observed, "[i]nterception and detection at international border crossings is likely the most effective way to protect the United States from terrorists and instruments of terrorism." *Tabbaa*, 2005 WL 3531828, at *15; *see also* H.R. Rep. No. 107-609(I) at 63-64, 66 (2002), *reprinted in* 2002 U.S.C.C.A.N. 1352 (discussing how stopping terrorists at the border is crucial to the government's effort to prevent acts of terrorism inside the United States).

Thus, when CBP officials received intelligence that gave them reason to believe that "certain individuals who were associated with terrorist organizations or activities . . . would be in attendance at the 2004 [RIS] conference," and that the conference "would serve as a possible meeting point for terrorists to exchange ideas and documents, coordinate operations, and raise funds intended for terrorist activities," CBP had ample justification to implement the IDSO,

border than in the interior" due to the government's "broad" and "comprehensive" powers "to protect the Nation by stopping and examining persons entering this country." *Montoya de Hernandez*, 473 U.S. at 537-38. It may also be true that the First Amendment's balance of interests is qualitatively different where, as here, the action being challenged is the government's attempt to exercise its broad authority to control who and what enters the country. *Cf. Ramsey*, 431 U.S. at 623-24 (declining, in a case involving the search of international mail crossing the border, to "consider the constitutional reach of the First Amendment in this area" because there had been no burden on protected First Amendment rights); *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) (declining to recognize a First Amendment exception to the border search doctrine for the search of expressive material). We do not need to reach this issue because defendants' actions easily pass muster under *Roberts*.

which was explicitly designed to detect and intercept potential terrorists from the conference who attempted to enter the United States. Importantly, the IDSO's reach was carefully circumscribed: it applied only to those conferences about which the government had specific intelligence regarding the possible congregation of suspected terrorists, it was limited to routine screening measures, and it was confined to those individuals, regardless of their religion, whom CBP could establish had attended the conferences in question.

Plaintiffs put forth two responses. First, they assert that *no* burden on their associational rights could be justified because "the First Amendment bars the government from penalizing mere participation in an expressive assembly, even if there is reason to believe that others associated with the assembly might be engaged in unlawful activity intended to undermine if not destroy the nation." For this extraordinary proposition, plaintiffs cite *De Jonge v. Oregon*, 299 U.S. 353 (1937), *United States v. Robel*, 389 U.S. 258 (1967), and *Aptheker v. Sec'y of State*, 378 U.S. 500 (1964).

These cases, however, are inapposite because they all involve categorical *prohibitions* on forms of association, as opposed to the indirect *burden* on association at issue here. In *De Jonge*, the Supreme Court struck down Oregon's criminal syndicalism statute, which made it a crime to speak at meetings of groups that advocate crime or sabotage. 299 U.S. at 357, 365. The Court emphasized that "[t]he holding of a meeting for peaceable political action cannot be proscribed," and held the statute unconstitutional because it made "mere participation in a peaceable assembly . . . the basis for a criminal charge." *Id.* at 365. Similarly, *Robel* involved a statute that made it unlawful for members of the Communist Party to work in a defense facility, 389 U.S. at 260-61, and *Aptheker* struck down a statute prohibiting members of the Communist Party from applying

23

for or using passports, 378 U.S. at 515-16. Here, the government did not make attendance at or participation in the RIS Conference unlawful, and the purpose of the government's actions was not to prevent people from associating at the conference, but rather to prevent terrorists from entering the country. Defendants' actions are not *per se* unconstitutional simply because innocent U.S. citizens such as plaintiffs were subject to enhanced processing techniques and thus experienced an indirect burden on their right to associate.

Second, plaintiffs contend that CBP could have achieved its interest in preventing terrorists from entering the country in a manner that would have been less restrictive of plaintiffs' associational freedoms. According to plaintiffs, rather than instituting the IDSO, the government could have surveilled the individuals identified in the intelligence as being associated with terrorism, or stopped at the border only those conference attendees whom the government had reason to believe had personally interacted with suspected terrorists. These are plainly not viable alternatives. As defendants point out, the U.S. government cannot freely conduct surveillance on private individuals in Canada, and, given that approximately 13,000 people attended the RIS Conference, it is entirely unrealistic to expect the government to have been able to identify and keep track of all those who personally interacted with suspected terrorists who attended the conference. Indeed, the IDSO was necessary precisely because of the infeasibility of knowing who at the conference may have interacted, and potentially exchanged identification or travel documents, with suspected terrorists.

Plaintiffs also suggest that CBP could have instituted a graduated process of inspection such that only those conference attendees about whom the government had individualized suspicion of a terrorist link or other criminal activity would have been subject to fingerprinting

24

and photographing. Plaintiffs place great emphasis on the fact that in February 2005 – two months after the searches at issue here – CBP modified its fingerprinting policy "to clarify that fingerprint checks should be run if there is at least one articulable fact concerning whether a traveler may lawfully enter the United States . . . ." The parties disagree as to whether plaintiffs would have been fingerprinted had this revised policy been in place in December 2004. Defendants say the revised policy would have made no difference because the IDSO could be considered an "articulable fact" that merits fingerprinting; plaintiffs contend that they would not have been fingerprinted because there was never any individualized suspicion that they had engaged in terrorist activity, and that the revised policy therefore raises a material issue as to whether there was a less restrictive means for the government to further its interest in protecting against terrorism.

Plaintiffs' argument fails for three reasons. First, CBP could have modified its fingerprinting policy for a host of reasons – such as political pressure or fear of litigation – unrelated to the policy's effectiveness in preventing terrorism. Second, even assuming that plaintiffs are correct about how the revised policy would be implemented, that does not mean it was unnecessary for CBP to fingerprint and photograph plaintiffs when they crossed the border in late 2004, especially given the nature of the intelligence the government received in advance of the RIS Conference. That intelligence gave rise to a reasonable concern that terrorists might use the conference to exchange "travel or identification documents such as passports or driver's licenses." In light of this concern, fingerprinting and photographing conference attendees was necessary to "ensure" that they were "who the[y] claim[ed] to be" – an objective that would not have been possible if CBP officials were limited to reviewing passports and other identification

25

documents.

Finally, *Roberts* does not require the government to exhaust every possible means of furthering its interest; rather, the government must show only that its interest "cannot be achieved through means *significantly less restrictive* of associational freedoms." *Roberts*, 468 U.S. at 623 (emphasis added). Plaintiffs' argument supposes that it would have been acceptable for CBP to have segregated conference attendees into the secondary search area, rigorously searched and questioned them, and detained them for a considerable period of time while running their names through various government databases – so long as plaintiffs were not also fingerprinted and photographed absent individualized suspicion. We do not believe the extra hassle of being fingerprinted and photographed – for the sole purpose of having their identities verified – is a "significant[]" additional burden that turns an otherwise constitutional policy into one that is unconstitutional.

Thus, we agree with the District Court that the government has a compelling interest in protecting against terrorism, and that it could not have achieved that interest "through means significantly less restrictive of [plaintiffs'] associational freedoms." *Id.* We therefore affirm the District Court's grant of summary judgment on plaintiffs' freedom of association claim.

**V. Defendants Did Not Violate Plaintiffs' Free Exercise Rights under RFRA or the First Amendment.**

Plaintiffs' remaining two claims are brought under the Religious Freedom Restoration Act and the free exercise clause of the First Amendment. RFRA provides that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except . . . if it demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is

26

the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1. Under the free exercise clause, a similar strict scrutiny test applies where a government policy targets a specific religious practice and substantially burdens that practice. *See Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) ("'To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.'") (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

Thus, assuming that the government's actions were not the result of a rule of general applicability, and that they imposed a substantial burden on plaintiffs' exercise of their faith, under both RFRA and the free exercise clause, defendants must show that the searches and detention of plaintiffs were in furtherance of a compelling governmental interest and were the least restrictive means of furthering that interest.[6]

We conclude that defendants have made this necessary showing for substantially the same reasons that their actions satisfied the *Roberts* test: given the intelligence the government received, subjecting RIS Conference attendees to enhanced processing at the border – including fingerprinting and photographing – was a narrowly tailored means of achieving the government's compelling interest in protecting against terrorism.

---

[6]Defendants argue that strict scrutiny should not apply to plaintiffs' free exercise claim because the enhanced screening measures did not substantially burden plaintiffs' ability to practice Islam, and the IDSO was issued for the "religiously neutral" purpose of searching all individuals – regardless of their religion – who had attended conferences for which the government had intelligence of potential terrorist involvement. We need not address these arguments because we find that the government's actions survive strict scrutiny.

27

Our conclusion in this regard is informed, in part, by our belief that some measure of deference is owed to CBP due to its considered expertise in carrying out its mission of protecting the border. In the prison context, it is well established that courts, when applying strict scrutiny under RFRA, "must give due deference to the judgment of prison officials, given their expertise and the significant security concerns implicated by prison regulations." *Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005) (citing *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004)); *see May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997); *cf. Lovelace v. Lee*, 472 F.3d 174, 192 (4th Cir. 2006) (applying same principle in case involving the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq.). While the border context is admittedly far from analogous to the concerns faced by prison officials, in the circumstances present in this case – in which border officials potentially faced a highly significant security issue based on the intelligence they received – we believe that some measure of deference is owed to CBP's administrative decisionmaking. CBP officials believed that because there was a potential that conference attendees would exchange passports or other identification documents with suspected terrorists, an enhanced screening process, including fingerprinting and photographing, was necessary to confirm the identities of conference attendees attempting to cross the border. Given CBP's extensive expertise in securing the border, and the fact that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border[,]" *Flores-Montano*, 541 U.S. at 152, we are unwilling to conclude, as plaintiffs would have it, that fingerprinting and photographing were not actually necessary to ensure that suspected terrorists leaving the RIS Conference did not enter the United States. *See Hoevenaar*, 422 F.3d at 370 (noting that a court should not use the least restrictive means test to "substitut[e]

28

its judgment in place of the experience and expertise of prison officials."). Rather, we find that given the compelling governmental interest at issue here (i.e., the prevention of potential terrorists from entering the United States), and the use of routine procedures by CBP to confirm the identities of people entering the United States, CBP's actions did not violate plaintiffs' rights, even under heightened scrutiny.

Accordingly, the District Court was correct in finding that plaintiffs' claims under RFRA and the free exercise clause of the First Amendment fail.

**CONCLUSION**

In sum, we hold that, as a matter of law, defendants, in detaining and searching plaintiffs as they crossed the U.S.-Canada border following the RIS Conference, did not violate the Administrative Procedure Act or plaintiffs' rights under RFRA or the First or Fourth Amendments to the U.S. Constitution. We therefore AFFIRM the judgment of the District Court.