856 F.2d 481
 26 Fed. R. Evid. Serv. 975
 In re DEPARTMENT OF INVESTIGATION OF the CITY OF NEW YORK,
Appellant.
UNITED STATES of America,
v.
Bess MYERSON, Carl Capasso, a/k/a "Andy Capasso," and
Hortense W. Gabel,
Hortense W. Gabel, Appellee.
 No. 1645, Docket 88-1279.
 United States Court of Appeals,
Second Circuit.
 Submitted July 15, 1988.
Decided Sept. 2, 1988.
 
 Stuart E. Abrams, Asst. U.S. Atty. for S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., New York City, David N. Lawrence, John F. Savarese, Asst. U.S. Attys., Kevin J. Ford, Sp. Asst. U.S. Atty., of counsel), for amicus curiae U.S.
 Doron Gopstein, First Asst. Corp. Counsel for City of New York, New York City (Peter L. Zimroth, Corp. Counsel for City of New York, Laurence A. Levy, David C. Bloomfield, Elizabeth I. Freedman, New York City, of counsel), for appellant.
 Michael S. Feldberg, New York City (Steven N. Gerstein, Shea & Gould, New York City, of counsel), for appellee Hortense W. Gabel.
 Before LUMBARD, MESKILL and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal by the Department of Investigation of the City of New York ("DOI") from Judge Keenan's order adjudicating DOI in contempt for refusing to produce documents subpoenaed by defendant Judge Hortense Gabel pursuant to Fed.R.Crim.P. 17(c). This adjudication followed our opinion denying appellant's petition for a writ of mandamus. In re Dep't of Investigation of the City of New York, 851 F.2d 65 (2d Cir.1988). Judge Keenan held that the so-called Tyler Commission's investigation was not for law enforcement purposes and that its records therefore fell within the scope of Fed.R.Crim.P. 17. We disagree and vacate the contempt order.
 
 
 2
 The principal issue concerns the status of the Tyler Commission. This Commission was created after Bess Myerson, then Commissioner of Cultural Affairs of the City of New York and now a defendant in this matter, invoked the fifth amendment before a federal grand jury. The grand jury's investigation arose out of Myerson's employment of Gabel's daughter in the Department of Cultural Affairs. At the time of this employment, Gabel was a Justice of the New York State Supreme Court and was the presiding judge in the divorce proceeding of defendant Carl Capasso, with whom Myerson was romantically involved. The grand jury's investigation focused on whether the employment of Gabel's daughter was a quid pro quo for Gabel's substantially reducing the maintenance and support payments Capasso was required to pay his wife.
 
 
 3
 Myerson was a close associate of Mayor Koch. Because the investigation raised questions regarding her conduct in office as the Commissioner of Cultural Affairs, political and prudential considerations necessitated a prompt, credible investigation. On January 22, 1987, Mayor Koch appointed Harold R. Tyler, Jr. as Special Counsel to the Mayor for the purpose of investigating "the circumstances and substantive issues in the context of which ... Myerson availed herself of her Fifth Amendment privilege before a Federal grand jury, and which might in any way involve the discharge of Commissioner Myerson's official duties and any other matters reasonably related thereto." Tyler was "empowered to conduct the investigation in the manner [he] deem[ed] necessary and appropriate."
 
 
 4
 The Mayor lacked the authority, however, to vest the Commission with compulsory process. On January 28, 1987, Kenneth Conboy, then Commissioner of the DOI, an agency with such power, designated Tyler and his staff as DOI agents "for the purpose of conducting the investigation directed by the Mayor on January 22, 1987 into matters which related or may relate to the office, standards, duties and actions of Bess Myerson as Cultural Affairs Commissioner...." Conboy's designation of Tyler and his staff specifically stated that any immunized testimony obtained from Myerson by the Commission under legal compulsion would not be disclosed to anyone in the DOI. Throughout its existence, the Commission was deliberately not informed of testimony or evidence presented to the federal grand jury.
 
 
 5
 Both before and after Myerson invoked the fifth amendment, the DOI had been an active participant in the federal investigation. A DOI Inspector General has been cross-designated as a Special Assistant United States Attorney for purposes of the investigation and trial, and several other DOI attorneys and investigators have, in the course of their participation in the federal investigation, had access to the federal grand jury minutes and evidence.
 
 
 6
 Throughout its existence, the Tyler Commission worked very closely with the DOI and the United States Attorney's Office. Tyler's unchallenged affidavit states:
 
 
 7
 Throughout [the] investigation, [the Tyler Commission] conferred regularly with senior officials at DOI regarding the conduct of the investigation. [DOI] advised [the Tyler Commission] on certain DOI policies and outlined some of the procedures that DOI would have used if it had been conducting the investigation directly. To assist in developing leads, [DOI] also gave [the Tyler Commission] access to several confidential DOI investigative files and information not developed through the federal grand jury investigation. As a result of [the Tyler Commission's] communications with DOI, [the two] frequently exchanged correspondence and prepared internal memoranda summarizing the substance of [their] conversations.
 
 
 8
 * * *
 
 
 9
 At the start of [the Tyler Commission's] investigation, [the Tyler Commission] met on two occasions with the U.S. Attorney and his staff to discuss the conduct of [the Tyler Commission's] investigation. Thereafter, [the Tyler Commission] conferred regularly with the U.S. Attorney's Office. The Government attorneys and investigators provided [the Tyler Commission] with non-grand jury information that helped [the Tyler Commission] to focus [its] investigation. Wherever possible, [the Government] also assisted [the Tyler Commission] in contacting witnesses and made available to [the Tyler Commission] numerous documents in [the Government's] custody that [the Tyler Commission] had subpoenaed from third parties. During the course of [the Tyler Commission's] investigation, [the Tyler Commission] regularly briefed the U.S. Attorney's Office following each deposition or witness interview and alerted them to possible leads. As in the case of DOI, [the Tyler Commission] occasionally exchanged correspondence and prepared internal memoranda and notes summarizing the substance of these communications.
 
 
 10
 Gabel's subpoena to the DOI concerns two sets of documents: (i) transcripts of testimony of Judge Gabel's husband, Milton Gabel, and her daughter, Sukhreet Gabel, taken by the Tyler Commission; and (ii) the notes and memoranda compiled by the Tyler Commission with respect to its interviews of thirty-two other witnesses.
 
 
 11
 Gabel's counsel has conceded in a letter to this court dated July 14, 1988 that if the Tyler Commission was an integral part of the DOI-United States Attorney investigation, its files would not be subject to subpoena under Rule 17. The basis for that concession is, of course, the law enforcement privilege, which has been recognized in the absence of a statutory foundation, see Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336 (D.C.Cir.1984); Black v. Sheraton Corporation of America, 564 F.2d 531, 541-42 (D.C.Cir.1977), and which is largely incorporated into the various state[1] and federal[2] freedom of information acts. The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation. See Aspin v. Dep't of Defense, 491 F.2d 24, 29-30 (D.C.Cir.1973); Frankel v. Securities and Exchange Commission, 460 F.2d 813, 817 (2d Cir.1972).
 
 
 12
 The question before us is whether the Tyler Commission was, as Gabel describes it, "an independent fact finding body created solely to investigate whether Bess Myerson should continue in office ... [and] not part of the DOI-U.S. Attorney investigation," letter of counsel for Hortense W. Gabel, dated July 14, 1988, at 1, or whether the Commission was an integral part of the DOI-United States Attorney investigation. Gabel's argument necessarily relies on the three factors that differentiate the Tyler Commission's labors from those of the DOI and United States Attorney. First, Tyler was appointed by the Mayor to look into Myerson's conduct in office and to report back to the Mayor. No mention was made of criminal proceedings. Second, under the terms of the DOI appointment, the Commission was not to share any immunized testimony by Myerson with DOI or federal personnel. Third, the Tyler Commission was at all times denied access to federal grand jury minutes.
 
 
 13
 Addressing the second and third factors first, we conclude that they provide little support for Gabel's contention. The restrictions on the use of immunized testimony and the denial of access to federal grand jury minutes were imposed precisely because it was contemplated that the Commission would be an integral part of the DOI-United States Attorney investigation and would consequently be treated for legal purposes as an agent of federal law enforcement officials. Tyler and his staff conferred regularly with federal investigators, received non-grand jury information from them and were assisted by them in contacting witnesses. The Commission in turn briefed federal investigators on each deposition it took and witness it interviewed, alerting them to leads. In addition, correspondence and internal memos were exchanged.
 
 
 14
 The anticipated close working-relationship between the Tyler Commission and the United States Attorney's office produced a well-founded fear that the courts would treat the Tyler Commission as an arm of the federal investigation. The limitation on the dissemination of immunized testimony (and the decision not to seek such testimony as well) obviously flowed from the justified apprehension that Myerson might claim that her prosecution violated the fifth amendment because it was based on testimony compelled by an agent of the federal investigation, the Tyler Commission. Access by the Commission to federal grand jury minutes was denied in order to foreclose a claim that the Commission's report to the Mayor violated Fed.R.Crim.P. 6(e).[3] The need for such restrictions thus arose out of the assumption that the Tyler Commission would be so closely involved in the DOI-United States Attorney investigation that it would be viewed as an arm of that investigation and that its conduct, if not carefully controlled, might jeopardize the federal investigation. We believe it would be perverse to hold that the Tyler Commission was not a part of the DOI-United States Attorney investigation on the basis of restrictions necessitated by the legal consequences of the fact that it was actually an integral part of that investigation.
 
 
 15
 We turn now to the Mayor's letter appointing Tyler. That appointment responded to the need for an efficient, reliable and publicly-credible investigation into Myerson's conduct in office. We do not believe, however, that the existence of this purpose excludes application of the law enforcement privilege to the Tyler Commission. Mayor Koch's letter in no way foreclosed Tyler from integrating his investigation with that of DOI and the United States Attorney. To the contrary, it specifically allowed Tyler to conduct the investigation "in the manner you deem necessary and appropriate." Immediately after Tyler was appointed, his staff became legally part of DOI. DOI staff advised the Commission on appropriate policies and procedures, gave it access to confidential investigative files and shared with it information from sources other than the federal grand jury. The Commission in turn shared all of its evidence with the DOI-United States Attorney investigation. As both a legal and practical matter, therefore, the Tyler Commission was an integral part of a DOI-United States Attorney investigation except for the restriction concerning grand jury minutes. (Immunized testimony having never been sought, the restriction on sharing became irrelevant.) Disclosure would thus reveal law enforcement techniques and procedures as well as confidential sources, precisely the result the law enforcement privilege is designed to prevent.
 
 
 16
 We are unwilling to say that the law enforcement privilege ceases to apply when an investigation is undertaken for the purpose of evaluating the conduct in office of a public official as well as for the purpose of determining whether that official should be formally charged with criminal conduct. Such dual-purpose investigations are routine where the fitness for office of a governmental official is called into question by allegations of criminal conduct. Moreover, where more than one group is engaged in the investigation, coordination of effort and sharing of information is also routine. Conducting entirely separate investigations, with redundant efforts and expenditures, would strain limited investigatory resources and would often result in no single investigation having access to all of the available information. Had Mayor Koch or Tyler prevented integration of the Commission's investigation with the ongoing DOI-United States Attorney investigation, they would have been justly subject to the criticism that separate investigations would lead to each having access to less than the full picture.
 
 
 17
 We perceive no reason to deny the protection of the law enforcement privilege to investigations that are for the dual purposes of evaluating conduct in office and enforcing the criminal law. The danger of exposing confidential sources, revealing techniques and procedures of law enforcement, and deterring witnesses from cooperating with law enforcement agencies out of fear of disclosure are as great when the investigation concerns fitness for office and criminal conduct also as when it concerns law enforcement alone. To compel disclosure of the Tyler Commission documents in issue would disclose a significant part of the DOI-United States Attorney investigation. For those reasons, state and federal freedom of information acts protect information compiled for law enforcement purposes even if fitness for office is also a subject of inquiry, Glantz v. Lupkin, 100 Misc.2d 453, 419 N.Y.S.2d 34 (1979), Koch v. Department of Justice, 376 F.Supp. 313 (D.D.C.1974), and we believe the non-statutory privilege is similarly broad.
 
 
 18
 Of course, when an investigation involves both fitness for office and possible criminal conduct, the danger that portions of the investigation will become public is heightened. Indeed, in the present case, the Tyler Commission's responsibilities included a report to the Mayor, who is not a law enforcement official. Although the report was protected against compulsory disclosure under New York law, see Matter of Cherkis v. Impelliteri, 307 N.Y. 132, 120 N.E.2d 530 (1954), it was leaked and thereafter formally made public. Such publicity implicates the law enforcement privilege because the privilege is designed not only to facilitate investigations, but also to protect individuals whose reputation may be damaged by disclosure of investigative leads or statements from witnesses developed during the investigation.
 
 
 19
 We believe, however, that the danger of such disclosure does not vitiate the law enforcement privilege. First, denial of the privilege would itself lead to routine disclosure. Denial would, therefore, enhance privacy only if it caused governmental officials to segregate investigations concerning fitness for office from investigations concerning criminal conduct. Such segregation would, as stated, be at a high cost in efficiency in the use of limited investigatory resources and in the comprehensiveness of the investigation. Second, in the case of governmental officials, public scrutiny may be necessary, particularly when allegations of criminal conduct have been made.
 
 
 20
 Finally, the independent counsel statute recently upheld by the Supreme Court, Morrison v. Olson, --- U.S. ----, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), provides that where a public official is the subject of an investigation by the independent counsel and is not indicted, the independent counsel is nevertheless to compile a report that may be made public, if publication is approved by the panel of judges to whom such report is presented. 28 U.S.C. Sec. 594(h)(2). The records of the independent counsel's investigation are, however, subject to the law enforcement exemption under the Freedom of Information Act. 28 U.S.C. Sec. 594(K)(3)(A). Similar protection should be extended to bodies such as the Tyler Commission.
 
 
 21
 We therefore vacate the contempt adjudication.
 
 MESKILL, Circuit Judge, dissenting:
 
 22
 Because I believe that the Tyler Commission was an independent, non-prosecutorial entity that was properly subject to subpoena under Fed.R.Crim.P. 17(c), and because I do not believe that Judge Keenan abused his discretion in ruling on the motion to quash the subpoena involved in this case, I respectfully dissent.
 
 
 23
 Before considering whether Judge Keenan properly ordered the Department of Investigation (DOI) to produce certain Tyler Commission documents pursuant to Rule 17(c), we must first consider the threshold question of whether the materials produced by that Commission were in fact part of a joint state-federal prosecution of the criminal defendants in this case. If they were, then the Commission's documents would not be subject to subpoena under Rule 17(c) and any discovery by Judge Gabel would be limited to that allowed by Fed.R.Crim.P. 16 and the Jencks Act, 18 U.S.C. Sec. 3500 (1982). See, e.g., Bowman Dairy Co. v. United States, 341 U.S. 214, 218-20, 71 S.Ct. 675, 677-79, 95 L.Ed. 879 (1951) (Rule 16); In re United States of America, 834 F.2d 283, 286 (2d Cir.1987) (Jencks Act); United States v. Covello, 410 F.2d 536, 543 & n. 10 (2d Cir.) (Jencks Act), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969). If, on the other hand, the Tyler Commission is viewed as a third party properly subject to subpoena under Rule 17(c), cf. Bowman, 341 U.S. at 220-21, 71 S.Ct. at 679, then we should only disturb Judge Keenan's treatment of the motion to quash in this case if it were an abuse of discretion, see United States v. Nixon, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).
 
 
 24
 I am not persuaded by the majority's argument that the Tyler Commission was so inextricably linked with the criminal investigation and prosecution in this case that its documents cannot be reached through a Rule 17(c) subpoena duces tecum. In fact, the circumstances surrounding the creation of the Commission convince me that it was intended solely as an independent, civil, factfinding body that would advise the Mayor of the City of New York on a personnel matter. Mayor Koch instructed Judge Tyler to
 
 
 25
 investigate the circumstances and substantive issues in the context of which New York City Cultural Affairs Commissioner Bess Myerson availed herself of her Fifth Amendment privilege before a Federal grand jury, and which might in any way involve the discharge of Commissioner Myerson's official duties and any other matters reasonably related thereto.
 
 
 26
 App. at 43. The Mayor further instructed Judge Tyler that he would have "broad investigative powers and [shall] prepare a written report of [his] findings and conclusions." Id. Nowhere in the letter appointing Judge Tyler was there any mention of the Commission's considering or initiating criminal charges. This is not surprising, since the Mayor, if he desired to take such steps, could simply have referred the matter to the DOI or to some other public agency that typically performs such prosecutorial functions.
 
 
 27
 The Tyler Commission, it seems to me, was created for one purpose: to give the Mayor an independent body, headed by a respected former judge, to advise him on a sensitive and widely publicized matter involving allegations of wrongdoing by a well known figure in his administration. The Mayor had an understandable and proper political purpose. Even Judge Tyler acknowledged that "the focus of the investigation was on whether [Bess] Myerson should continue in office." See id. at 139. Yet now, having reaped the political benefits inherent in the creation of such an independent entity, the City, through the DOI, claims that the Tyler Commission was really part of the criminal investigation all along. I simply do not believe that the City can have it both ways. Having chosen to create a separate, investigative body to help resolve an essentially political dilemma, the City should live with the consequences of that decision.
 
 
 28
 The DOI and the majority both make much of Judge Tyler's understanding from the outset that the members of the Commission were obligated to forward any evidence of criminal wrongdoing to prosecutors. But, that is an obligation of every citizen. See, e.g., Roberts v. United States, 445 U.S. 552, 557-58, 100 S.Ct. 1358, 1362-63, 63 L.Ed.2d 622 (1980). It certainly does not arise from any terms of the document creating the Commission. In Judge Tyler's own view, it emanated from section 803(c) of Chapter 34 of the Charter of the City of New York. See App. at 139. That provision obligates the DOI itself to forward any evidence of criminal conduct discovered in the course of a routine investigation to "the appropriate prosecuting attorney." Judge Tyler undoubtedly viewed himself and his Commission as subject to this provision by virtue of the Commission members' designation as special DOI agents for purposes of their probe. But it is undisputed that the Commission members were made DOI agents simply to provide them with the power of compulsory process. See In re Department of Investigation of the City of New York, 851 F.2d 65, 66 (2d Cir.1988) (DOI I ). Moreover, they were given that power only so that they could " 'conduct[ ] the investigation directed by the Mayor ... into matters which related or may relate to the office, standards, duties and actions of Bess Myerson as Cultural Affairs Commissioner....' " Id.
 
 
 29
 Thus, the mere sense of obligation to forward any evidence of criminality to the appropriate authorities does not by itself bolster the majority's argument that the Tyler Commission was part and parcel of the criminal prosecution in this case. If anything, it only clarifies that the Tyler Commission was acting outside the scope of the joint, pre-existing criminal investigation being conducted by the DOI and federal authorities, see id., and that the Commission did not possess any power in its own right to initiate a criminal prosecution. Moreover, the Commission was not made privy to the secret proceedings of the ongoing federal grand jury investigation. See id. Again, that fact only serves, in my judgment, to indicate that the Tyler Commission was acting outside of and separate from the criminal prosecution.
 
 
 30
 We have clearly held that "in the absence of a joint federal-state investigation," documents generated and held by state law enforcement officials are not subject to the Jencks Act. United States v. Paternina-Vergara, 749 F.2d 993, 997 (2d Cir.1984), cert. denied, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). See also United States v. Bermudez, 526 F.2d 89, 100 & n. 9 (2d Cir.1975), cert. denied, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). Here, although the DOI clearly was cooperating with the federal prosecutors, see DOI I, 851 F.2d at 66, I do not believe that the Tyler Commission properly was. Therefore, I do not believe that documents independently produced by the Commission as part of its separate, non-prosecutorial mission are subject to the strictures of the Jencks Act. Moreover, for the same reasons, I do not believe that criminal defendants seeking to reach documents independently produced by the Tyler Commission should be subject to the limited discovery provisions of Fed.R.Crim.P. 16. Rather, documents produced by the Tyler Commission, which the prosecution subsequently "obtained ... by solicitation or voluntarily from [a] third p[arty, would be] subject to subpoena [under Fed.R.Crim.P. 17(c) ]." See Bowman, 341 U.S. at 221, 71 S.Ct. at 679.
 
 
 31
 Having concluded that documents produced by the Tyler Commission were subject to subpoena under Rule 17(c), I have little trouble concluding that Judge Keenan did not abuse his discretion in his treatment of the government's motion to quash. Judge Keenan conducted an in camera review of the documentation sought and decided on an individualized basis that certain materials could be reached through the subpoena and that other materials could not. In some instances, he concluded that documents were protected by privileges; in other cases, he concluded that certain material would not be properly subject to the Rule 17(c) subpoena under the standards enunciated in United States v. Nixon, 418 U.S. at 699-700, 94 S.Ct. at 3103. As for the remainder of the material, Judge Keenan concluded that it met all of the necessary Nixon criteria. In this regard, Judge Keenan adopted an admittedly "liberal" view of the requirement that such material be "evidentiary and relevant." See App. at 12. Given Judge Keenan's familiarity with the facts at issue in the case and given his interest in avoiding unnecessary delays during trial if voluminous documents were not obtained by the defendants until that time, I believe that he was acting well within his discretion. See Nixon, 418 U.S. at 699-702, 94 S.Ct. at 3103-05. Judge Keenan decided that a failure to provide Judge Gabel with pretrial access to many of these documents could " 'tend to unreasonably delay the trial.' " App. at 11 (quoting Nixon, 418 U.S. at 699, 94 S.Ct. at 3103).
 
 
 32
 I would affirm the contempt order of the district court.
 
 
 
 [1]
 See, e.g., N.Y. Pub.Off.Law Sec. 87 subd. 2(e) (McKinney 1988). That section protects against disclosure records that:
 (e) are compiled for law enforcement purposes and which, if disclosed, would:
 i. interfere with law enforcement investigations or judicial proceedings;
 ii. deprive a person of a right to a fair trial or impartial adjudication;
 iii. identify a confidential source or disclose confidential information relating to a criminal investigation; or
 iv. reveal criminal investigative techniques or procedures, except routine techniques and procedures....
 
 
 [2]
 See 5 U.S.C. Sec. 552(b)(7) (1988). The section protects from disclosure:
 (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) would reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidental source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.
 
 
 [3]
 Fed.R.Crim.P. 6(e)(2) states:
 A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.
 The Mayor does not fall within any of the exceptions to this rule.