Michael SCHILLER, et al., Plaintiffs,

v.

The CITY OF NEW YORK,
et al., Defendants.

Hacer Dinler, et al., Plaintiffs,

v.

The City of New York, et al., Defendants.

Nos. 04 Civ. 7922(RJS)(JCF),
04 Civ. 7921(RJS)(JCF).

United States District Court,
S.D. New York.

Aug. 13, 2008.

Christopher Dunn, Esq., Palyn Hung, Esq., New York Civil Liberties Union, New York City, for Plaintiffs.

Peter G. Farrell, Esq., Special Assistant Corporation Counsel, Tonya Jenerette, Esq., Senior Corporation Counsel, City of New York Law Department, New York City, for Defendants.

### MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

These are two of the cases arising from hundreds of arrests that took place in connection with the Republican National Convention (the "RNC") in 2004. In early 2007, the plaintiffs in these cases moved to compel the production of certain intelligence documents in the possession of the New York City Police Department (the "NYPD"). I reviewed the disputed documents *in camera* and, by Memorandum and Order dated August 6, 2007 (the "August 6 Order"), I granted the plaintiffs' motion in part and ordered the defendants (hereinafter the "City") to produce the majority of the documents in redacted form. *Schiller v. City of New York,* 244 F.R.D. 273 (S.D.N.Y.2007). The City subsequently filed objections to my August 6 Order, proffering a declaration from NYPD Deputy Commissioner of Intelligence David Cohen. On November 28, 2007, the Honorable Richard J. Sullivan, U.S.D.J., remanded the matter so that I could determine whether Commissioner Cohen's declaration necessitated reconsideration of any part of my August 6 Order. (Order dated Nov. 28, 2008). For the reasons discussed below, reconsideration is granted in part. I have provided the defendants with copies of the documents for which alterations to the redactions should be made, and they shall be produced to the plaintiffs in accordance with this Order.

*Background*

A. *The Disputed Documents*

The factual background of this dispute has been set forth in prior opinions, *see Schiller v. City of New York,* Nos. 04 Civ. 7922 & 04 Civ. 7921, 2007 WL 1461378, at *1–2 (S.D.N.Y. May 18, 2007); *Schiller v. City of New York,* Nos. 04 Civ. 7922 & 04 Civ. 7921, 2007 WL 735010, at *1–2 (S.D.N.Y. March 12, 2007), and will be repeated here only to the extent that it is relevant to the remand. Prior to the RNC, the Intelligence Division of the NYPD, led by Commissioner Cohen, launched an information gathering effort to assess the potential security threat presented by anticipated protest activities. (Declaration of David Cohen dated May 2, 2007 ("Cohen 5/2/07 Decl."), attached as Exh. B to Declaration of Tonya Jenerette dated June 12, 2008 ("Jenerette 6/12/08 Decl."), ¶¶ 1, 6). That effort included internet research, use of confidential informants, and monitoring by undercover officers. The information was analyzed by Commissioner Cohen and presented to the RNC Executive Committee [1] in the form of "end-user" reports. (Declaration of David Cohen dated June 6, 2007 ("Cohen 6/6/07 Decl.") attached as Exh. A to Jenerette 6/12/08 Decl., ¶¶ 5–6; Cohen 5/2/07 Decl., ¶¶ 9, 11, 13). The end-user reports were provided to the plaintiffs in January 2007.

Subsequently, the plaintiffs determined that the 600 pages of end-user reports "were only part of the Defendants' pre-RNC intelligence gathering" (Letter of Palyn Hung dated April 12, 2007 at 2), and served a request on the City seeking the remainder of the documents. On May 18, 2007, I determined

---

**1.** Members of the Executive Committee, which included Police Commissioner Raymond Kelly, Chief of Department Joseph Esposito, and other high-ranking NYPD officials, were responsible for formulating the policies challenged by the plaintiffs in these cases. (Cohen 5/2/07 Decl., ¶ 9).

that this document request was not overly broad and was sufficiently likely to lead to the discovery of admissible evidence. *Schiller,* 2007 WL 1461378, at *2–3.

The City objected to production of the additional intelligence documents on the basis that portions of them are protected by the law enforcement privilege. In particular, the City has asserted the privilege with respect to three categories of documents. The first category consists of "raw, unevaluated field intelligence reports," also known as "DD5s," which were prepared by undercover officers or their handlers.[2] The City contends that these reports are wholly protected by the privilege. The second category includes 84 other documents that the City also claims are privileged in their entirety. The third category consists of 177 documents that the City is willing to produce in part. (Declaration of David Cohen dated April 30, 2008 ("Supplemental Cohen Decl."), ¶ 7; Cohen 6/6/08 Decl., ¶¶ 6–7).

B. *The August 6 Order*

In my August 6 Order, I concluded that nearly 300 pages of category 1 documents and 40 pages of category 2 documents did not contain substantive information relevant to the RNC and therefore did not need to be produced to the plaintiffs. *Schiller,* 244 F.R.D. at 278 & n. 9, 280 & n. 14. With respect to the remainder of the documents, however, I determined that materials from all three categories must be produced to the plaintiffs, subject to certain redactions. First, I ordered the field intelligence reports produced with the following information redacted: (1) case number, (2) date of report, (3) date of opening of the investigation, (4) identity of the reporting unit, (5) identity of the reporting person, (6) date, time, and location of the event reported on, (7) meeting activities, and (8) name or description of individuals present. *Id.* at 277–79. In general, the names of organizations and data gath-

ered by the Intelligence Division regarding RNC-related protest activity of those organizations were left intact, though I redacted a limited amount of information where disclosure could lead to the identification of an undercover officer. *Id.* at 279. Next, I ordered the documents in category 2 produced with redactions along similar lines. However, I permitted 44 of the remaining pages from category 2—documents discussing logistics of the NYPD's intelligence gathering operation and observations from non-RNC demonstrations in other cities—to be withheld in their entirety because their disclosure would have likely revealed confidential law enforcement tactics and because they did not contain information about activists' RNC-related plans. *Id.* at 280 & n. 15.

In category 3, I largely adopted the redactions made by the City; however, I ordered some of the redacted information disclosed because it was not apparently subject to the law enforcement privilege. For example, I ruled that information obtained as the result of an undercover investigation was not *per se* privileged and that redactions made on that basis were therefore not justified in the absence of a specific showing that disclosure of the information would jeopardize ongoing or future investigations. *Id.* at 281.

C. *Subsequent Procedural History*

In the August 6 Order, I expressly noted that my ruling with respect to documents in categories 2 and 3 was based in part on the defendants' failure to "explain how [the documents] implicate[d] the privilege, as [they] had done] with the field intelligence reports." *Id.* at 280 n. 13. Accordingly, when the City sought to file objections to my August 6 Order, it submitted a supplemental declaration from Commissioner Cohen, in part to address this deficiency. (Declaration of David Cohen dated Aug. 27, 2007 ("Cohen 8/27/07 Decl."); Letter of Peter G. Farrell, dated Aug. 31, 2007, at 1).[3] The City also

---

**2.** "Handlers" are the officers "responsible for working with undercovers on a daily basis." They are "engaged in confidential assignments," and the fact that they are assigned to work with an undercover officer is "known only by NYPD Intelligence Division personnel." (Cohen 6/6/07 Decl., ¶ 18).

**3.** The Supplemental Cohen Declaration submitted as part of the City's current motion is nearly identical to the 8/27/07 Cohen Declaration previously submitted.

applied for permission to serve a redacted version of the Supplemental Cohen Declaration on plaintiffs' counsel and to file an unredacted copy under seal for *ex parte* review by the Court. Because the Supplemental Cohen Declaration was submitted for the first time on appeal, Judge Sullivan remanded the matter so that I would have the opportunity to consider any new arguments advanced by the City based on the Declaration.

Before I could reach the merits of the City's arguments on remand, I had to rule on its application to submit the Supplemental Cohen Declaration *ex parte*, and on January 22, 2008, I denied the application. *Schiller v. City of New York*, Nos. 04 Civ. 7922 & 04 Civ. 7921, 2008 WL 186203 (S.D.N.Y. Jan. 22, 2008). That determination was upheld by Judge Sullivan. *Schiller v. City of New York*, Nos. 04 Civ. 7922 & 04 Civ. 7921, 2008 WL 1777848 (S.D.N.Y. April 14, 2008). Subsequently, the City provided the plaintiffs with a revised, unredacted declaration, and the parties submitted briefs in support of their respective positions. All of these documents were initially reviewed by the plaintiffs on an attorneys'-eyes-only basis; however, the parties have since agreed on redacted versions that have been publicly filed.[4]

*Discussion*

### A. The Law Enforcement Privilege

██ The purpose of the law enforcement privilege

> is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

*In re Department of Investigation of the City of New York*, 856 F.2d 481, 484 (2d Cir.1988). Parties seeking the protection of the privilege must first "make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." *Kunstler v. City of New York*, Nos. 04 Civ. 1145, 04 Civ. 665 & 04 Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); *see also MacWade v. Kelly*, 230 F.R.D. 379, 381 (S.D.N.Y.2005) (party asserting law enforcement privilege "must make a clear showing of harm"). While declarations and affidavits from law enforcement officials are certainly helpful in this respect, the court is not required "to defer blindly to assertions made by ... offici[s] regarding the existence of the law enforcement privilege." *MacNamara v. City of New York*, 249 F.R.D. 70, 85 (S.D.N.Y. 2008).

██ Once the party asserting the privilege "make[s] a threshold showing that the privilege attaches," *City of New York v. Beretta*, 222 F.R.D. 51, 66 (E.D.N.Y.2004) (internal quotation marks and citation omitted), the court must then " 'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.' " *Kunstler v. City of New York*, 439 F.Supp.2d 327, 328 (S.D.N.Y.2006) (quoting *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C.Cir. 1984)); *see also Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006); *Borchers v. Commercial Union Assurance Co.*, 874 F.Supp. 78, 80 (S.D.N.Y.1995). In determining whether to order disclosure, the court "must also consider the value of appropriate protective orders and redactions," *MacNamara*, 249 F.R.D. at 79 (quoting *King v. Conde*, 121 F.R.D. 180, 190–91 (E.D.N.Y.1988)), particularly where "[s]uch an order can mitigate many if not all of the oft-alleged injuries to the police and to law enforcement." *King*, 121 F.R.D. at 190.

### B. Changes to the August 6 Order

#### 1. Field Intelligence Reports

##### a. Group Names

██ The City renews its argument that the names of the organizations subject to

---

4. I have adapted my discussion of the relevant issues to preserve confidential information contained in the documents. While doing so has sacrificed some clarity, I have aimed to keep my reasoning as transparent as possible.

confidential investigations by the NYPD should not be disclosed. I previously found that while the City had a legitimate law enforcement interest in withholding this information, that interest was outweighed by the plaintiffs' need for it. *Schiller*, 244 F.R.D. at 278–79. The City disagrees with the weight I attached to the plaintiffs' and the defendants' respective interests.

First, the City contests my observation that many of the activist groups have already been alerted to the possibility that they were under surveillance because that information was contained in the end-user reports. It points out that the end-user reports did not disclose the names of organizations that were subject to covert monitoring, and only referenced those "that openly discussed their [ ] plans on the internet or in other publicly available sources." (Defendants' Reply in Support of Motion For Reconsideration of August 6, 2007 Order ("Def.Reply") at 13). However, the end-user reports do reveal that NYPD officers or informants attended meetings and joined the listservs of certain groups and reported back to the Intelligence Division. (End–User Reports, attached as Exh. B to Declaration of Tonya Jenerette dated June 25, 2008, at 102551–54, 102624). In addition, media reports publicizing undercover NYPD intelligence gathering prior to the RNC were widely circulated. *See, e.g.,* Judith Miller, *When Activists Are Terrorists,* Wall St. J., May 3, 2007, at A17; Jim Dwyer, *City Police Spied Broadly Before G.O.P. Convention,* N.Y. Times, March 25, 2007, at A1. As a consequence, any group that suspected that it was a subject of the NYPD's investigation is likely to have already taken any action it would take in response to infor-

mation in the DD5s. Moreover, the groups themselves will not have access to the documents; only plaintiffs' counsel will.[5] Thus, the fact that the precise groups that were subject to undercover monitoring are not currently known does not significantly alter the analysis, and I decline to modify my prior determination in this respect.

Next, the City challenges the plaintiffs' need for the group names in light of the fact that the already-disclosed end-user reports reveal the names of a significant number of groups that the NYPD knew were planning to engage in civil disobedience at the RNC. (Def. Reply at 19–20). The City also emphasizes, as it did in the last round of briefing, that it intends to rely solely on the end-user reports for its defense. But as I previously noted, "[t]he plaintiffs are entitled to discovery of all of the information considered by Commissioner Cohen," not just information that is favorable to the defendants or on which the defendants intend to rely. *Schiller*, 2007 WL 1461378, at *3. Commissioner Cohen clearly considered the content of the field reports in creating the end-user reports and updating the RNC Executive Committee. (Cohen 6/6/07 Decl., ¶ 5; Def. Reply at 20 n. 34). Thus, the end-user reports are no substitute for the information in the field reports, namely, which groups were subject to direct observation and what the NYPD learned through such observation.

The City also contends that the plaintiffs' alleged need for information about the nature of the threat posed by these groups is not compelling because, under the Second Circuit's decision in *MacWade v. Kelly,* 460 F.3d

---

5. I previously ordered that the City should provide only a single set of the redacted intelligence documents to plaintiffs' counsel, to be securely maintained at the offices of the New York Civil Liberties Union (the "NYCLU") and subject to an attorneys'-eyes-only designation. *Schiller*, 244 F.R.D. at 279 n. 11. The City has raised concerns regarding the adequacy of these restrictions in light of (1) the presumption of public access that will attach should the documents be submitted with a motion for summary judgment or introduced at trial, or (2) the possibility that the documents could be leaked or that plaintiffs' counsel might discuss the content of the documents with their clients. (Def. Reply at 23–24). However, in the event that a party moves to lift the sealing provisions in order to submit documents, the City will be able to advance the same arguments in favor of confidentiality in later stages of the litigation as it does now. Moreover, the latter scenarios assume that the Court's orders will be violated, and the City has offered no reason for believing that that is likely. These concerns therefore do not justify denying the plaintiffs discovery to which they are otherwise entitled. While the protective provisions do not overcome the law enforcement privilege in every case, particularly where the information has "severely limited relevance" and "the [ ] risk to law enforcement programs" is high, *MacNamara,* 249 F.R.D. at 88, they do carry significant weight in the balancing analysis.

260 (2d Cir.2006), courts may not consider such evidence. (Letter of Tonya Jenerette dated June 25, 2008, at 2). However, the *MacWade* case concerned the constitutionality of the NYPD's suspicionless subway bag search program under the special needs doctrine, a doctrine that is not at issue in the RNC cases. Furthermore, the present cases are distinguishable because the documents sought by the plaintiffs relate not to the effectiveness of the NYPD's mass arrest policies here, but rather to the authenticity of the threat that purportedly justified these policies in the first instance.

The City also cites to *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir.2007), in support of its argument that the plaintiffs will not be able to use the information in these documents to challenge the NYPD policies. While the trial court in *Tabbaa* found "disclosure of the full nature of the government's intelligence [ ] not necessary to resolve Plaintiffs' claims," *Tabbaa v. Chertoff*, No. 05–CV–582, 2005 WL 3531828, at *2 n. 2 (S.D.N.Y. Dec. 22, 2005), the Second Circuit, out of an "abundance of caution," reviewed the classified intelligence documents *ex parte* and *in camera* to "ensure independently that there was a sufficient basis for [the Bureau of Customs and Border Protection's] statements." *Tabbaa*, 509 F.3d at 93 n. 1. Far from foreclosing judicial scrutiny of agency policy, then, the court found it appropriate to assess whether the classified information relied upon by the defendant contradicted information contained in the public record. The *Tabbaa* case also is inapposite because the plaintiffs here do not seek any classified information that would risk the disclosure of state secrets. Finally, it is worth noting that plaintiffs' counsel in *Tabbaa* did not actually request discovery of the classified information that was ultimately reviewed by the Second Cir-

cuit, *Tabbaa v. Chertoff*, No. 05–CV–582, slip op. at 9 (W.D.N.Y. Nov. 28, 2005), so the question of the plaintiffs' entitlement to that information was never reached.

b. *Descriptive Information*

 The City next argues that descriptive information other than group names should not be disclosed, particularly where that information was known to only a small group of people (25 or less), because it might enable the reader to pinpoint the meeting or communication where that information was shared and thus identify the undercover officer. (Supplemental Cohen Declaration, ¶¶ 15–17, 23, 28–29, 32). While there is some logic to this argument, much of the information contained in the field reports is not sufficiently unique or memorable to lead to the harm identified by the City, especially given the extensive redactions that have already been permitted.

Some information in the reports, however, does warrant greater attention. Where a report on a group meeting describes conversations among only a few individuals and the content is memorable (Supplemental Cohen Declaration, ¶¶ 19, 24), the risk that an undercover officer might be identified is less remote. However, those meetings, conversations, and incidents also tend to be the ones that directly addressed plans for the RNC,[6] and in at least one instance, described occurrences at the RNC itself.[7] Thus, the plaintiffs' interest in them is at its highest. In addition, the harm described by the City would only materialize if the reports were accessed by a "participant to the conversation," or "those that were present at the incident." (Supplemental Cohen Declaration, ¶¶ 19, 24). Since the names of these individ-

---

**6.** As noted in the August 6 Order, one individual encountered by the NYPD made comments that were not always made in connection with the RNC. However, since he clearly planned to attend the RNC, I deemed his comments advocating the use of violence to be relevant. *Schiller*, 244 F.R.D. at 279 n. 12. I also deemed the fact that these comments were made by a single individual to be relevant, and therefore assigned him the pseudonym "John Doe" to make it clear that the same individual was being referred to throughout. *Id.*

**7.** Although occurrences during the RNC obviously do not bear directly on the NYPD's pre-RNC formulation of policies, the report is valuable because it describes circumstances leading up to arrests at several locations. *See MacNamara*, 249 F.R.D. at 94 (finding deposition testimony of undercover officers during RNC demonstrations to be "plainly relevant" to plaintiffs' claims).

uals are redacted and the reports will only be available to plaintiffs' counsel, that would not be the case here. Accordingly, while the City has made some showing of potential harm, taking all of the relevant factors into account, I conclude that these reports should nevertheless be disclosed subject to the protective measures previously ordered.

### c. *Geographic Location*

The City further argues that disclosure of information in connection with a meeting or communication where the group "hails from a specific geographic area" or "other geographic identifying information [has been] left in the report" makes it more likely that the identity of an undercover officer could be discovered. (Supplemental Cohen Declaration, ¶¶ 20, 25, 30–31, 33). Though, as the defendants point out, I did determine in the August 6 Order that location information should be redacted, that was because the plaintiffs have little or no interest in knowing the locale from which an undercover officer is reporting. On the other hand, for the same reasons that the plaintiffs have an interest in the group names, they also have an interest in knowing if the NYPD monitored affiliates or chapters of the same organization in different localities, or tracked regional coalitions formed in anticipation of the RNC. However, because in many instances a geographic reference in a group name or a city or region discussed with respect to plans for

the RNC tends to give away the undercover's location, and because a reasonable accommodation is largely practicable here, I will permit the City to redact those references and replace them with codes ("L-1," "L–2," etc. for metropolitan areas, and "S–1," "S–2," etc. for states) to allow plaintiffs' counsel to discern the difference between affiliates and coalitions in various localities.[8] Any remaining concern about, for example, revealing the names of organizations that hail only from a single specific locality, is adequately addressed by the attorneys'-eyes-only designation.

### 2. *Category 2 Documents*

As discussed above, the City has now explained more clearly how information in the category 2 documents implicates the law enforcement privilege.

First, the City contends that a substantial amount of information should be withheld merely on the ground that it was obtained from undercover reporting. (Supplemental Cohen Declaration, ¶ 35). But I previously noted that "information is not privileged simply because it was obtained as a result of an undercover investigation." *Schiller*, 244 F.R.D. at 281. Thus, this explanation does not suffice to show that the privilege attaches. In some instances, however, a document listed by the City is analogous to a field intelligence report (because it

---

8. In the interest of keeping the codes simple, the same code should be used where the location reference is to different parts of the same metropolitan area or to an address or landmark within that area. I have generally redacted references to New York where they appear as part of a group name, but not where the city is discussed in connection with RNC-related events and plans. A number of other location references on 23 pages appear to have been left off Commissioner Cohen's declaration; however, because the locations at issue are those that the City indicated it would like to keep confidential, I have included them in my review. I have also redacted some location references that are not used in connection with an undercover investigation where the same references are used in connection with an undercover investigation in other documents. Additional location redactions are permitted on the following pages: 12–13, 32, 37–38, 41–42, 44, 49, 51, 54–55, 58, 60–62, 64–66, 68–71, 73, 75, 78, 83–84, 86, 88–89, 91–94, 97, 102, 105, 107, 109–10, 112, 114–18, 122, 126, 128, 130, 132, 134–35, 138, 141–44, 146, 149, 152, 154–55, 160, 165, 169–73, 177–79, 181–82, 185, 188–91, 193–94, 198–99, 202–06, 214–15, 218–20, 224–28, 238, 240, 242, 244, 255, 265, 278, 298, 306, 317, 320, 332, 335, 337, 340, 345, 350, 355–56, 358–59, 361, 363, 367–70, 373–74, 378, 380–81, 383, 498, 503, 506–07, 509–10, 512, 521, 525, 532, 537–38, 540, 545–47, 550, 555, 560, 564, 568, 571, 574, 579–80, 582, 585–86, 590, 605–07, 610, 613, 616–17, 621, 624, 626, 628, 634, 637, 639–40, 646–47, 650–51, 654, 658, 660–61, 663–64, 667, 669–70, 673–75, 678, 701, 704–06, 711–12, 720, 723–26, 729–30, 741–42, 746–47, 749–50, 757–59, 764, 768–71, 774, 776–78, 790–91, 793–99, 806–09, 811, 813–15, 818, 831, 835, 864, 870, 890, 892, 896, 902, 915, 932, 934–35, 954, 1036, 1041–42, 1045, 1055, 1057, 1061, 1063–64, 1067, 1072, 1074–75, 1078–80, 1083, 1085, 1122, 1138–39, 1141, 1144–46, 1148, 1150, 1154, 1183, 1196, 1218, 1240, 1242, 1268, 1270, 1276, 1279, 1281, 1286, 1294, 1303, 1308, 1310, 1312–14, and 1316.

discusses a group meeting or communication where an undercover officer was present) [9] or the City has provided additional justification for applying the privilege (e.g., descriptive content only available to a very limited number of persons). Where that is the case, I have weighed the parties respective interests consistent with the principles outlined above and made some additional redactions where appropriate. In addition, the City has argued that information should be withheld where it was provided by another law enforcement agency. (Supplemental Cohen Decl., ¶ 35). In the same way that information is not privileged simply because it was obtained as a result of a covert investigation, information is not privileged by virtue of its having originated with another law enforcement agency. On the other hand, the City has a legitimate interest in maintaining as confidential the identity of the law enforcement agencies it called upon while gathering intelligence for the RNC. I have therefore also made redactions on certain pages where this information appears.[10] Finally, I have redacted certain references to geographic location consistent with the principles articulated earlier.[11]

Furthermore, the City asserts that it should be permitted to withhold a 29–page document that identifies individuals of interest to the NYPD because it contains an evaluative assessment of those individuals based on certain types of information. According to the City, individuals and groups who have access to this document could block the NYPD's efforts to ascertain the same kind of background information in the future, rendering the tool ineffective. (Supplemental Cohen Declaration, ¶ 40). This argument is not persuasive. The type of information included in the document is, for the most part, exactly the information that one would expect the NYPD to track. However, I will permit the ratings themselves to be redacted because the pairing of individuals' back-

ground information together with those ratings has the potential to reveal something about the Intelligence Division's methodology for choosing where to focus its resources.[12] Though the anticipated harm to future operations is less than clear, the plaintiffs' need for these assessments is also not as compelling as their need for the raw data underlying them.

Finally, the City points to several documents that it argues should be withheld on the ground that they reveal the capacity of the Intelligence Division and disclose details about the deployment of NYPD personnel. However, the information that the City objects to disclosing is not necessarily related to "the capacities of the Intelligence Division." (Supplemental Cohen Declaration, ¶ 41). The Intelligence Division may have had the capacity to investigate any number of individuals but, for unrelated reasons, opted not to. Similarly, the City has not identified any specific harm that would result from disclosure of information about the deployment of NYPD personnel during the RNC. *See MacNamara*, 249 F.R.D. at 91–92 (upholding my determination that the City had failed to make threshold showing of harm from disclosure of numbers and ranks of officers deployed at different locations during the RNC). Therefore, no additional redactions are warranted in this regard.

### 3. Category 3 Documents

The City has also provided more specific information regarding how the category 3 documents implicate the law enforcement privilege. As with the category 2 documents, the City contends that a substantial amount of information in category 3 must be withheld on the ground that it was obtained as a result of undercover reporting. (Supplemental Cohen Declaration, ¶ 43). That is not

---

9. Some of the documents at issue are in fact category 1 documents but were inadvertently misclassified as category 2 documents. (Supplemental Cohen Declaration, ¶ 35).

10. Allowable redactions for undercover reporting and for the identity of other law enforcement agencies appear on pages 386, 405–07, 409, 416, 1358–61, 1365, and 2008–09.

11. These redactions appear on pages 385–86, 389, 394–95, 397, 401–06, 416, 434, 436, 438–39, 442, 444, 447, 450, 453, 455, 457, 459, 462–63, 468–69, 471, 475, 1323, 1382, 1386, 1421, 1427, 1429, and 1994–95.

12. Accordingly, redactions are permitted on pages 1989–2017.

sufficient on its own; however, I have adjusted the redaction of a limited number of documents where the City has provided persuasive additional justification for applying the privilege and the plaintiffs' interest in the information is not substantial.[13] I have also redacted some additional references in this category to geographic locations and to the individual discussed in footnote 6.[14]

In one instance, as with the 29–page document in category 2, the City has asked that information about the NYPD's assessment of certain groups be redacted. (Supplemental Cohen Declaration, ¶ 43). Upon reviewing the category 3 document, I find that the comments in question do not constitute the kind of systematic rating at issue in the category 2 documents but rather the Intelligence Division's general characterization of the nature of the groups discussed. Thus, while I permitted ratings to be redacted earlier, no further redactions are appropriate here.

The City has also asked that all references to one particular group be redacted because, given the unique circumstances of this group, disclosure of the NYPD's intelligence could reveal the identify of the informant to the group's very small membership. (Supplemental Cohen Declaration, ¶¶ 43–44; Def. Reply at 14–15). While the acknowledgment that there was a confidential source in the ranks is not usually sufficient to justify redaction, here, according to Commissioner Cohen, even referencing basic information about the group could lead to identification of the confidential source. I will therefore permit the City to redact the name of the group and certain identifying information where it appears in category 3 (the group name may be replaced with a pseudonym such as "Group A").[15] However, because the plaintiff's interest in information that the Intelligence Division obtained about this group is substantial and because that information is not so unique that it would give away the identity of the group, I will not redact discussion of the group's protest style and mission.

Finally, the City identifies a number of category 3 documents that it inadvertently failed to redact when they were first submitted for *in camera* review. (Supplemental Cohen Declaration, ¶ 44). I have reviewed these documents and conclude that some of them may be redacted on the basis of the law enforcement privilege.[16] Copies of those documents have been provided to the defendants.

### 4. *Other Changes*

#### a. *Ongoing Investigations*

The City asserts that a number of documents in all three categories should be withheld on the further ground that they implicate active investigations. (Supplemental Cohen Declaration, ¶ 45; Def. Reply at 15 & n. 25). To be sure, the law enforcement privilege applies with particular force where discovery would lead to interference with a pending investigation. *See Startzell v. City of Philadelphia*, No. 05–05287, 2006 WL 2945226, at *4 (E.D.Pa. Oct. 13, 2006). However, it does not follow that documents are privileged simply because they were created pursuant to an investigation that is still active, especially where, as here, the documents at issue discuss events remote in time. The City is still required to show how disclosure of specific information would jeopardize or harm the investigation. *See Kitevski*, 2006 WL 680527, at *3. Moreover, the City has not explained why some documents concerning individuals or groups subject to active investigations should be redacted and others not.[17]

---

**13.** In one instance, I have unredacted information that I had previously ordered redacted because, as the City points out, it contains information that is publicly available and is arguably relevant to the RNC. The adjustments appear on pages 1464–67, 1725, 1802, 1849, and 1891.

**14.** Location redactions appear on pages 1678, 1681–84, 1687, 1688–90, 1701–02, 1724, 1729–31, 1749–50, 1765, 1767, 1915–16, 1950, 1959–61, and 1973–74. References to the individual assigned the pseudonym "John Doe" appear on pages 1613, 1656, 1660, 1700–01, 1736, and 1744.

**15.** Alterations appear on pages 491, 1361, 1456, 1467, 1476, 1496, 1797, 1806, and 1808.

**16.** Redactions are warranted on pages 1528, 1532, 1535–36, and 1540.

**17.** For example, pages 290–91 and 293–96 relate to the same type of gathering of the same group that is mentioned in pages 308–09; however, the

Nevertheless, as a cautionary measure, I have made limited additional redactions where the documents do not exclusively discuss the RNC.[18]

In addition, the City objects to the disclosure of documents that contain intelligence gathered at specific types of venues. It argues that while the names of the venues were redacted by operation of the August 6 Order, the documents still contain descriptive information from which the venues might be ascertained. (Supplemental Cohen Declaration, ¶ 46). Reviewing the documents again, I have made a limited number of additional redactions based on the remote possibility that such information could lead to the identification of a venue.[19] I will not, however, redact references to the types of venues themselves. Notwithstanding the City's contention that even confirming the presence of an undercover at a certain type of venue would be detrimental (Supplemental Cohen Declaration, ¶ 46), the mere revelation that the Intelligence Division stationed an officer or informant at a generic category of venue, be it a social club, internet cafe, or some other kind of establishment, is not sufficiently specific or novel to be likely to harm future law enforcement efforts.

b. *Corrections to August 6 Redactions*

Finally, in addition to the changes discussed above, I have made a small number of corrections to the redactions set forth in my August 6 Order where information was inadvertently redacted or left unredacted. These corrections serve to make the redactions consistent throughout the documents as a whole.[20]

*Conclusion*

For the reasons set forth above, the August 6 Order is amended in part. The City must produce the disputed documents to the plaintiffs with the permitted redactions. The City need only produce one set of documents, which shall be securely maintained at the NYCLU offices and subject to an attorneys'-eyes-only designation. Other counsel appearing for the plaintiffs in the related cases may review the documents at the NYCLU offices but may not remove them and may copy them only as necessary to submit them to the Court as sealed exhibits.

SO ORDERED.

City has included the latter but not the former on the list of documents that should be further redacted due to an active investigation.

**18.** These redactions appear on pages 309, 1108, 1110, 1240, 1258, and 1399.

**19.** I have made redactions on pages 459 and 471 on this basis.

**20.** These changes appear on pages 62, 70, 112, 135, 177, 200, 225, 229, 242, 254, 298, 368, 418, 427, 432, 503, 617, 725, 833, 870, 915, 934, 1041, 10 72, 1150, 1195–96, 1212, 1228, 1230, 1279, 1283–84, 1290, 1298, 1301, 1310, 1313, 1316, 1400, 1459, 1465, 1536, 1719, 1779, 1812, 1896, and 1994.