Adriana **AGUILAR**, et al., Plaintiffs,

v.

**IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,** Defendants.

No. 07 Civ. 8224(JGK)(FM).

United States District Court, S.D. New York.

June 23, 2009.

Donna Lynn Gordon, Kelly Hsiao–I Tsai, Jennifer Opheim Whitener, Kelly Anne Librera, Rebecca Marie Reilly, Dewey & Leboeuf, L.L.P., Foster S. Maer, Ghita Schwarz, Jackson Chin, Puerto Rican Legal Defense and Education Fund, Inc., Christina Iturralde, Latino Justice PRLDEF, New York, NY, for Plaintiffs.

Elizabeth Wolstein, Lara K. Eshkenazi, Kristin Lynn Vassallo, Shane Patrick Cargo, U.S. Attorney's Office, New York, NY, for Defendants.

### DISCOVERY ORDER

FRANK MAAS, United States Magistrate Judge.

This putative class action is brought by more than thirty named Latino plaintiffs ("Plaintiffs") who contend that the Immigration and Customs Enforcement Division of the Department of Homeland Security ("ICE") and certain of its agents (collectively, "Defendants") systematically conducted unconstitutional home raids in 2006 and 2007. These ICE operations had a number of different names, including Operation Return to Sender, Operation Cross Check, and Operation Community Shield. One branch of Operation Community Shield, captioned "Operation Surge," took place in Nassau and Suffolk Counties from September 24 though September 29, 2007. The ostensible purpose of that operation was to arrest known gang members who were subject to removal from the United States based on their criminal records. In their Third Amended Complaint, the Plaintiffs allege that Operation Surge and the other programs violate the Fourth Amendment rights of Latinos in general. They further allege that the Fourth Amendment rights of certain named Plaintiffs were violated in connection with raids conducted by ICE at nine specific locations ("Complaint Locations").

Following several rounds of discussions among the parties, the Plaintiffs have filed a motion to compel the production of certain documents relating to Operation Surge which the Defendants have withheld on law enforcement privilege grounds. I have reviewed the parties' motion papers and also have conducted an *in camera* review of excerpts from the withheld documents provided by the Defendants. For the reasons set forth below, the Plaintiffs' motion (Docket No. 130) is granted in part and denied in part.

### I. *Background*

On August 18, 2008, the Defendants provided the Plaintiffs with a privilege log identifying thirty-one documents that had been withheld on law enforcement privilege grounds.[1] (*See* Defs.' Mem. at 5). In a subsequent letter dated September 29, 2008, the Defendants explained that these documents contained identifying information about individuals who might be the subject of further investigation by ICE. (Defs.' Mem. at 5; Decl. of Ass't U.S. Att'y Lara Eshkenazi, dated Jan. 29, 2009 ("Eshkenazi Decl."), Ex. A at 3). They later elaborated that some persons they consider to be of continuing investigative interest may have been apprehended during Operation Surge, while others were not. (*See* Defs.' Mem. at 5).

In their motion, the Plaintiffs seek the production of the documents on the Defendants' privilege log numbered as documents 2, 3, 5–8, 10, 12–16, 18–19, and 21–31.[2] Because many of these documents are dupli-

---

1. On December 23, 2008, the Defendants provided the Plaintiffs with a revised privilege log listing the same thirty-one documents, but also identifying the cover emails to which the documents were attached. (Pls.' Mem. at 8).

2. The Plaintiffs also requested document 11, but later withdrew that request. (*See* Reply at 1 n. 1).

cates, the Plaintiffs in fact are seeking the production of only twelve discrete documents, listed as documents 2, 5, 7, 8, 10, 12, 13, 15, 19, 22, 29, and 31 on the privilege log.[3]

In their papers, the Plaintiffs note that they have agreed to significant redactions of these documents. Thus, with respect to various spreadsheets listing potential raid targets, the Plaintiffs seek only the information in the columns listing each target's zip code, country of origin, nationality, gang affiliation, race, and criminal charge justifying the targeting of that individual.[4] Significantly, the Plaintiffs *do not* seek the names of the targets unless those names correspond to a name or a Complaint Location identified in their complaint.[5]

The Defendants have voluntarily disclosed name and address information concerning the targets associated with the Complaint Locations, but maintain that any additional information contained in the withheld documents is subject to the law enforcement privilege and should not be disclosed. (Defs.' Mem. at 7, 10–11).

## II. *Discussion*

### A. *Applicable Law*

Rule 37 of the Federal Rules of Civil Procedure provides that "[i]f a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R.Civ.P. 37(a)(3)(A). A party asserting a privilege with respect to documents otherwise discoverable bears the burden of justifying the privilege's application. *See United States v. Adlman*, 68 F.3d 1495, 1500 (2d Cir.1995); *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y.1988); *see also Strougo v. BEA Assocs.*, 199 F.R.D. 515, 519 (S.D.N.Y.2001) ("[P]roponent of a privilege log must set forth facts therein that would establish each

element of the claimed privilege as to each disputed document.").

Here, the Defendants rely on the law enforcement privilege. The purpose of this privilege is to prevent the disclosure of "law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Schiller v. City of New York*, 252 F.R.D. 204, 207 (S.D.N.Y.2008) (quoting *In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir.1988)) (internal quotation marks omitted). "An investigation need not be ongoing for the law enforcement privilege to apply as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed." *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y.2000) (internal quotation marks omitted).

Although courts recognize a law enforcement privilege, it is a qualified privilege. Accordingly, the Court must balance the alleged need for the information against the public's interest in disclosure or nondisclosure. *Kunstler v. City of New York*, 439 F.Supp.2d 327, 328 (S.D.N.Y.2006); *Otterson v. National R.R. Passenger Corp.*, 228 F.R.D. 205, 207 (S.D.N.Y.2005). There is, however, no need to engage in this exercise unless the party withholding the documents can make a threshold showing that the privilege attaches. *City of New York v. Beretta*, 222 F.R.D. 51, 66 (E.D.N.Y.2004); *Fountain v. City of New York*, No. 03 Civ. 4526(RWS), 2004 WL 941242, at *3 (S.D.N.Y. May 3, 2004) (citing *King*, 121 F.R.D. at 189).

In assessing whether a threshold showing has been made, a court need not

---

**3.** The following sets of documents on the privilege log are duplicates: (5, 6), (2, 3, 21), (15, 16, 27, 28, 30), (19, 26), (13, 14, 18, 23, 24, 25). (*See* Decl. of Jennifer O. Whitener, Esq., dated Jan. 9, 2009, Ex. D).

**4.** The Plaintiffs also have indicated that they are amenable to redacting "PIN numbers, NYSID numbers, prison or jail 'InDate' and 'OutDate' information, ICN numbers, NYSIIS numbers,

NCJ numbers, NCPD numbers, A-numbers, FBI numbers, [and] A-file information, or Civ ID numbers." (Pls.' Mem. at 13).

**5.** Although the Plaintiffs' papers refer to Complaint Locations identified in their Second Amended Complaint, they since have filed a Third Amended Complaint.

"defer blindly to assertions made by ... official[s] regarding the existence of the law enforcement privilege." *MacNamara v. City of New York*, 249 F.R.D. 70, 85 (S.D.N.Y. 2008). Rather, the party opposing disclosure must make a "clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted." *Schiller*, 252 F.R.D. at 207 (internal quotation marks omitted); *see also MacWade v. Kelly*, 230 F.R.D. 379, 381 (S.D.N.Y.2005) (party asserting privilege "must make a clear showing of harm").

In *King*, Judge Weinstein suggested some ground rules regarding the requirement of a threshold showing in a federal civil rights action. According to Judge Weinstein, to be sufficient, an affidavit or declaration opposing disclosure must be

> based on personal review of the documents by an official in the police agency (not the defendants' attorney) and must explain (not merely state conclusorily) how the materials at issue have been generated or collected; how they have been kept confidential; what specific interests (e.g. of the police officers, of law enforcement, or of public concern) would be injured by disclosure to plaintiff, to plaintiff's attorney, and to the public; and the projected severity of each such injury.

*King*, 121 F.R.D. at 189.

■ If a threshold showing is made, the court then must balance various interests in determining whether to order disclosure. Among the factors favoring disclosure of the allegedly privileged information are a showing of its relevance, its importance to the plaintiff's case, the strength of the plaintiff's case, and the importance of the evidence to the public interest. *Id.* at 194–95. The factors favoring nondisclosure include any threat to the safety or privacy of law enforcement officials, any weakening of law enforcement programs, the chilling of police investigative or civilian complaint candor, and any applicable state privacy laws. *Id.* at 191–94. *See also United States v. Painting Known as "Le Marche,"* No. 06 Civ. 12994(RJS)(KNF), 2008 WL 2600659, at *2 (S.D.N.Y. Jun. 25, 2008) (quoting balancing factors outlined in

*Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973)).

■ In determining whether the requisite showing has been made, the court must also consider whether a protective order or redactions can obviate the alleged harm to law enforcement. *King*, 121 F.R.D. at 190; *see also Zhao v. City of New York*, No. 07 Civ. 3636(LAK)(MHD), 2007 WL 4358470, at *4 (S.D.N.Y. Dec. 5, 2007) (noting defendants' failure to address why theoretical dangers from disclosure could not be remedied with a protective order).

### B. Defendants' Threshold Showing

The Plaintiffs argue that the Defendants have failed to make a threshold showing because they did not submit a declaration by a law enforcement official in conjunction with their initial assertion of the privilege. They further argue that the Defendants have failed to identify the harm that would result from disclosure with sufficient particularity in light of the existing Confidentiality Order. (Pls.' Mem. at 9).

#### 1. Declaration

As part of their opposition papers, the Defendants have submitted the declaration of John P. Torres, the Acting Assistant Secretary of ICE. ("Torres Declaration" or "Torres Decl."). The Plaintiffs take issue with the timing and substance of the Torres Declaration, contending that it should have been produced earlier in response to their discovery request, and that it fails to specify how the withheld documents were generated and kept confidential, and the harm, if any, that would result from disclosure. (Pls.' Mem. at 14–15; Reply at 2–3).

■ In *"Le Marche,"* 2008 WL 2600659, at *3, upon which the Plaintiffs rely, Magistrate Judge Kevin Fox determined that the Government had failed to make a threshold showing because an affidavit was not submitted to the court or the claimant prior to the submission of the *in rem* claimant's motion to compel. Quoting *Kelly v. City of San Jose*, 114 F.R.D. 653, 670 (N.D.Cal.1987), Judge Fox explained that the requirement of a "situation-specific" affidavit serves to provide

the adversary with a "fair opportunity to challenge the bases for the assertion of the privilege." *Id.* In *Kelly*, the court had held that a declaration or affidavit *must* be submitted at the time a party files its response to a discovery request. 114 F.R.D. at 669; *see also King*, 121 F.R.D. at 189 (objections to discovery request must be accompanied by affidavit).

Although the submission of a declaration at an earlier time might have aided the Plaintiffs in formulating their motion to compel, our local rules concerning the assertion of a privilege claim impose no such requirement. *See* Local Civ. R. 26.2(a). Moreover, on December 12, 2008, when the parties appeared in court so that ICE could demonstrate the operation of one of its databases, I specifically advised the parties that the Defendants need not submit an affidavit or declaration prior to the filing of the Plaintiffs' motion to compel. (*See* Eshkenazi Decl. ¶ 5). The Defendants' failure to provide a declaration at an earlier date consequently is not fatal to their effort to make a threshold showing.

The Plaintiffs further contend that the Torres Declaration is deficient because it fails to establish that the documents on the privilege log have been kept confidential, who has seen them, and whether they have been released in another context. (Reply at 2–3) (citing *King*, 121 F.R.D. at 189). Indeed, according to the Plaintiffs, the Defendants previously have produced documents similar to those they now seek to withhold and have shared similar data—albeit regarding a different investigation—with other law enforcement and research agencies, as well as the media. (*Id.* at 3–4).

There is no question that an affidavit or declaration must be submitted to the Court, but it is less clear that such a document must contain all of the elements outlined by Judge Weinstein in *King* in order to make a threshold showing of privilege. Indeed, at least one court has taken issue with the *King* requirements. *See Martin v. Lamb*, 122 F.R.D. 143, 147 n. 1 (W.D.N.Y.1988) ("Mechanistic application in every case of the procedures outlined in [*King*] would engender a waste of attorney, police agency, and judicial resources in all but the unusual

cases."). Here, the Torres Declaration meets many of the requirements set forth in *King*. For example, Secretary Torres describes each document in considerable detail and provides at least some information about who has seen each document. (See, e.g., Torres Decl. ¶¶ 11 (indicating that document 1 is a spreadsheet which was attached to an email to ICE from Suffolk County law enforcement officials), 15 (indicating that document 5 is a spreadsheet which was attached to an email to ICE from the Suffolk County Sheriff's Office)). Accordingly, I find that the Torres Declaration does not fail on this account.

### 2. Harm

The Plaintiffs further contend that the Defendants have not sufficiently identified the harm that might result from the disclosure of the redacted documents to the Plaintiffs' counsel pursuant to the existing Confidentiality Order. (Pls.' Mem. at 12; Reply at 4). In that regard, they note that the "Defendants have produced at least two other target lists" pursuant to the Confidentiality Order, that there has been no showing that any leaks of confidential information have resulted, and that the information in the documents is, in any event, likely to be stale since it was assembled approximately two years ago. (Pls.' Mem. at 12–13; Reply at 4).

The Defendants, by contrast, represent that the documents relate to ongoing investigations, and Secretary Torres states that disclosure of the investigative targets could cause such persons to "alter their behavior by changing their appearance, . . . alerting their compatriots and co-conspirators, or . . . hiding from law enforcement authorities." (Torres Decl. ¶¶ 43, 44). Secretary Torres further asserts that targets could use the spreadsheet information to anticipate ICE activities or alert associates that they are under investigation. (*Id.*). He also alleges that disclosure poses a threat to law enforcement agents who reasonably assume that such information has remained confidential. (*Id.*). Secretary Torres adds that some listed individuals are or might become confidential informants so "the fact that a listed individual is no longer under investigation

does not remove the consequences of disclosing his or her identity." (*Id.*). Finally, he asserts that if an individual on the list is perceived to be under investigation, he or she could be targeted for harassment or physical harm. (*Id.*).

The Defendants appear primarily to be concerned that were the documents to fall into the wrong hands, targets would be able to identify themselves and alter their behavior. Indeed, Secretary Torres states that each spreadsheet "contains enough personal information to enable the listed persons to identify themselves and others." (Torres Decl. ¶ 43). While this may be true of the spreadsheets in unredacted form, it fails to take into account the fact that the Plaintiffs seek only limited types of information with respect to each of the spreadsheets.

■ For example, with respect to document 5, the Plaintiffs seek only the information in the fields related to each person's gang affiliation, zip code and criminal history, and, if a name corresponds to a Complaint Location, the person's name. (*See* Decl. of Donna L. Gordon, Esq., dated Jan. 9, 2008 ("Gordon Decl."), ¶ 6). (For ease of reference, this last item, which is often repeated throughout the Plaintiffs' requests, will henceforth be referred to as "Complaint Names.") Although it seems unlikely that a target could identify himself from the combination of a gang affiliation, zip code, and criminal history, it is conceivable that some criminal charges listed are sufficiently unique to allow identification. This potential harm, however, is easily addressed by permitting the Defendants to redact the specific criminal charge if they are able to certify that its disclosure (together with the other fields) would be tantamount to disclosing the target's name.[6]

■ Document 22 identifies about 1,000 persons arrested as part of Operation Surge, while document 31 identifies approximately 1,300 persons arrested as part of Operations Community Shield and Surge. The original documents list, *inter alia*, each arrestee's arrest date, name, date of birth, citizenship, and "A" number, the nature of the underlying charge ("Crim" or "Admin") and the specifics if known, whether the arrestee's criminal history includes violence, the arrestee's gang affiliation and role in the gang. Document 31 also lists the Office of Investigation office involved. Of these fields, the Plaintiffs seek each person's gang affiliation, country of citizenship, prior criminal charges, arrest date (for document 22), office information (for document 31), and any Complaint Names. (Gordon Decl. ¶¶ 15, 17). Neither document contains address information so Complaint Names cannot be provided. (Torres Decl. ¶¶ 32, 41). The production of these documents consequently would disclose only the arrestee's gang information, criminal history, nationality, and, for document 22, arrest date. Inasmuch as the persons on these lists have already been arrested, the Defendants have not made a convincing showing that *any* harm would result if this information were to be disclosed subject to the Confidentiality Order.

■ Document 7 lists approximately 3,000 persons with criminal records suspected of gang activity in Nassau County. The spreadsheet contains the suspects' names and other identifying information, including case numbers, gang affiliation, date of birth, sex, race, and height. For each person on the list, the Plaintiffs seek the gang affiliation, race and location information, as well as any Complaint Names. (Gordon Decl. ¶ 7). Since this spreadsheet does not contain any addresses, Complaint Names cannot be provided. (Torres Decl. ¶ 17). Accordingly, as Secretary Torres himself concedes, the fields sought would disclose "only that an unnamed subject . . . was, for example, a Hispanic member of MS–13." (*Id.*). Given this limitation, the Defendants clearly cannot make out a meritorious case that law enforcement would be prejudiced if the information requested were to be disclosed.

---

6. There are blanks in the criminal history column as well as indications that certain of the criminal histories involved youthful offender charges or were unknown. Since the criminal history field is blank in certain instances, any redactions of information in the criminal history field will have to be plainly indicated to distinguish them from spaces that are blank on the original.

The same holds true for documents 13 and 29, for which the Plaintiffs seek only gang affiliation, nationality, and Complaint Names, and document 15, for which Plaintiffs seek only gang affiliation, country of birth, and Complaint Names. (Gordon Decl. ¶¶ 12–13, 16). In the absence of any addresses on these spreadsheets, Complaint Names cannot be provided. Consequently, disclosure simply would reveal, for example, that "natives of Mexico, El Salvador, Jamaica, and Canada were suspected members of MS–13," (Torres Decl. ¶ 23) or that "some natives of Colombia, Jamaica, Guatemala, and Tobago were suspected members of MS–13," (*id.* ¶ 39). Again, it is difficult to see how a target could be identified—or law enforcement prejudiced—by the disclosure of this limited information.

In short, the Defendants have failed to make a threshold showing of specific harm that warrants blanket application of the law enforcement privilege to the above-referenced documents. Moreover, I am not persuaded that production of these documents pursuant to the Confidentiality Order would impact ICE's operations by revealing the way that ICE establishes its priorities. (*See* Defs.' Mem. at 11; Torres Decl. ¶ 43). Indeed, the disclosure of redacted documents containing the limited fields sought by the Plaintiffs would no more "reveal ICE's intelligence-gathering activities related to violent crime investigations" and "hamper ICE's ability to continue its operations" than would the summary descriptions of the documents that Secretary Torres himself has provided in his declaration. Accordingly, documents 5, 7, 13, 15, 22, 29, and 31 must be produced to the Plaintiffs, subject to the redactions I have indicated.

Turning to document 8, which relates to gang members in Suffolk County, the Plaintiffs seek only Complaint Names. (Gordon Decl. ¶ 8). The Defendants have represented that this document does not contain any Complaint Names. (Torres Decl. ¶ 18). Accordingly, document 8 need not be produced.

As to the remaining documents, the Plaintiffs seek, among other fields, Complaint Name information for documents 2, 10, 12, and 19. (Gordon Decl. ¶¶ 5, 9, 11, 14). The

Defendants have indicated that three of these documents—documents 2, 12, and 19—contain Complaint Names, and they have provided the responsive information by setting it forth in an exhibit to the Torres Declaration. (Torres Decl. ¶¶ 12, 22, 29 & Ex. B).

In their reply papers, the Plaintiffs allege that the Complaint Name information provided by the Defendants is demonstrably wrong. For example, they contend that document 2 erroneously lists a United States citizen as a target at a Complaint Location, and that document 12 indicates that certain targets live at an address that does not exist. (Reply at 9–10). They argue that further disclosure is necessary to enable them to learn why a United States citizen allegedly appears on one document and to show that the Plaintiffs face the likelihood of future harm because the Defendants' raid plans are developed based on inaccurate target lists. (*Id.* at 10). The Plaintiffs concede, however, that the mistaken address information may have been caused by the Defendants' faulty transcription of the address information from the original documents rather than an error in the documents themselves. (*Id.*). The Plaintiffs argue that they therefore need the original documents to ensure the accuracy of the information provided by the Defendants and to authenticate the information they have been provided. (*Id.*).

■ I agree that the Plaintiffs should not have to rely on the Defendants' abstract of the information on the documents containing Complaint Names. The Defendants, however, have made a threshold showing of potential harm with respect to documents 2, 10, 12, and 19. Specifically, targets may be able to identify themselves from the addresses that the Plaintiffs seek for documents 2 and 19 (Gordon Decl. ¶ 5, 14); from the addresses and nationality information they seek for document 10 (*id.* ¶ 9); and from the address and gang affiliation information they seek for document 12 (*id.* ¶ 11).

As the Plaintiffs correctly note, there is no suggestion that information previously disclosed under the terms of the Confidentiality Order in this case has been compromised. (*See* Pls.' Mem. at 12; Reply at 4). Never-

theless, I accept the Defendants' representations that the information in these documents is highly sensitive and thus carries a great risk associated with disclosure, no matter how unlikely it is that counsel would leak the information. (Defs.' Mem. at 4–5; Torres Decl. ¶ 53). Accordingly, I will turn to the balancing of the parties' respective interests concerning the Plaintiffs' request for the disclosure of information in the four remaining documents. For the reasons that follow, the Defendants will be required to produce copies of documents 2, 10, 12, and 19 subject to certain redactions.

### C. Balancing

The Plaintiffs assert that disclosure is warranted because (1) the information in the documents is relevant, (2) they have been unsuccessful in their efforts to obtain the information from other sources, (3) their claims are meritorious, and (4) disclosure is in the public interest. (Pls.' Mem. at 17; Reply at 6). For their part, the Defendants maintain that disclosure of the documents would weaken future law enforcement operations, chill investigative candor, and threaten the safety of law enforcement officials. (Defs.' Mem. at 13).

#### a. Relevance

##### i. Injunctive Relief

The Plaintiffs seek nationality and address information in connection with their claim for injunctive relief, which alleges that Plaintiffs and putative class members are more likely to experience future raids because they are Latino.[7] (Pls.' Mem. at 18–19). According to the Plaintiffs, "members of an 'identifiable class of targeted individuals,' such as [ ] race—or ethnicity-based classes or geographically limited classes, have standing to sue for injunctive relief." (Id. at 19). The Plaintiffs believe the documents may demonstrate that ICE operations are focused on a limited geographic area and, if those areas are majority-Latino, engender an increased likelihood that the Plaintiffs and other Latinos will suffer future harm. (Reply at 11).

The Defendants counter that the standing inquiry must focus on the named Plaintiffs, not members of a proposed class of "Latinos in the New York area." (Defs.' Mem. at 15). They argue that disclosure of documents that list addresses other than complaint locations will not shed light on ICE's intentions regarding future raids. (Id. at 14–15). They further suggest that the Plaintiffs have demonstrated only past injury, not prospective injury. (Id. at 19).

As the Plaintiffs correctly observe, to be relevant, discovery need not be admissible, so long as it is reasonably calculated to lead to admissible evidence. See Fed. R. Civ. P 26(b). This broad rule of relevance is liberally construed. EEOC v. Nichols Gas & Oil, Inc., 256 F.R.D. 114, 118 (W.D.N.Y.2009) (citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S., 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)). Thus, the Plaintiffs need not demonstrate that they have standing or are entitled to injunctive relief, only that the information they seek is relevant to those claims.

 To establish standing to assert a claim, "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision. In a class action, once standing is established for a named plaintiff, standing is established for the entire class." Kendall v. Employees Ret. Plan of Avon Prods., 561 F.3d 112, 118 (2d Cir.2009). In other words, a named class plaintiff must demonstrate a case or controversy with the defendant and must "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 433 F.3d 181, 199 (2d Cir.2005) (quoting Warth v. Seldin, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). To demonstrate standing to seek injunctive relief, a plaintiff must

---

7. The Plaintiffs also sought country of origin information in connection with this claim, but none of the four documents being considered at the balancing phase of the inquiry contain that field. (Pls.' Mem. at 18).

establish that he sustained or is in danger of sustaining direct injury resulting from the challenged conduct. *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir.2004). A plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future." *Id.* (internal quotations omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

In this case, the Plaintiffs assert various theories of standing, including that the Defendants' actions are "part of an ongoing government pattern, practice, or policy," which gives rise to a "credible threat of future harm," and that the Defendants' targeting of individuals or neighborhoods by race, coupled with the ICE agents' explicit threats, make it more likely that the homes of Latinos—and therefore the Plaintiffs—will be raided in the future. (Reply at 7–8). The Defendants' opposition papers raise legitimate questions regarding these theories—such as whether "Latinos in the New York area" constitutes an identifiable class, *see Roe v. City of New York*, 151 F.Supp.2d 495, 504 (S.D.N.Y.2001), and whether Plaintiffs who were subjected to only one raid have standing, *see Nat'l Congress*, 75 F.Supp.2d at 161. (Defs.' Mem. at 15–16). As noted above, however, the Plaintiffs need not conclusively establish their standing at this preliminary stage. Accordingly, because the information the Plaintiffs seek in the four remaining documents is conceivably relevant to the theories of standing which are colorable, this factor favors disclosure insofar as the claim for injunctive relief is concerned.

### ii. *Bivens Claim*

██ The Plaintiffs also state that the gang affiliation, address, criminal history, and nationality fields that the Defendants have withheld on law enforcement privilege grounds are relevant to their *Bivens* claims. (Pls.' Mem. at 19–20; Reply at 13). They note that they intend to test the Defendants'

public statements as to how their investigations were organized, including their statement that priority was given to violations involving national security and criminal activity. (Pls.' Mem. at 20). The Plaintiffs also assert that the information that they seek is relevant to their claims that the supervisory Defendants failed to train or supervise their agents adequately. (*Id.*). To prevail on the latter claims, the Plaintiffs must show that the supervisors knew to a "moral certainty" that their subordinates would confront a difficult situation, that either the situation is one that training would help ameliorate or that here is a history of such situations being mishandled, and that a wrong choice frequently would lead to a deprivation of constitutional dimensions. *Walker v. New York*, 974 F.2d 293, 297–98 (2d Cir.1992). Here, the information the Plaintiffs seek may not conclusively demonstrate what supervisors actually knew about the situations their subordinates would confront. At a minimum, however, the information that the Plaintiffs seek might be relevant to whether a law enforcement officer participating in the ICE operations in fact was likely to encounter known gang members, with criminal records or Spanish-speaker individuals during the course of a raid.

### b. *Unavailability*

Not surprisingly, the Plaintiffs also allege that they have been unable to obtain the information that they seek from any other sources despite their efforts to do so. (Pls.' Mem. at 21). Indeed, they note that many of the documents appear to be ICE-generated and thus not available elsewhere. (*Id.* at 21). They also note that local police departments have not responded to subpoenas seeking documents that either were generated by or shared with ICE. (*Id.*). Because the materials that the Plaintiffs seek are relevant, the unavailability factor obviously weighs in favor of disclosure. *Compare MacNamara*, 249 F.R.D. at 88 (denying disclosure of documents unobtainable from an alternative source, despite the existence of a protective order, in part because of their "severely limited relevance").

#### c. Merit

 The Plaintiffs also allege that their injunctive relief and *Bivens* claims have merit, noting that Defendants' home raid programs have been criticized by the press and have generated numerous lawsuits. (Pls.' Mem. at 21–22). The fact that the Defendants' home raids have been controversial does not necessarily mean that they are unlawful. By the same token, however, the Plaintiffs' claims clearly cannot be dismissed as frivolous. As Judge Weinstein noted in *King*, at the discovery stage any doubts with respect to the merits of a civil rights claim should be resolved in the claimant's favor. *King*, 121 F.R.D. at 195. Accordingly, this factor, too, weighs in favor of disclosure.

#### d. Public Interest

The parties differ as to where the public interest lies with respect to the Plaintiffs' request for the production of the disputed documents. The Plaintiffs contend that this factor favors disclosure because the public has a legitimate concern that police operations be conducted lawfully and that individual liberties be protected. (Pls.' Mem. at 22). The Defendants assert that this factor favors nondisclosure because the public interest would not be served by compromising ICE's ability to "investigate and apprehend criminal aliens who are members of violent gangs." (Defs.' Mem. at 20). There is something to be said for both viewpoints. Accordingly, because this is not a case in which only one side can claim the moral high ground, this factor does not augur strongly for or against disclosure.

#### e. *Investigative Candor*

The Defendants also contend that "internal investigative candor would be chilled by the disclosure of the documents because ICE agents may be less likely to create the types of spreadsheets listed on the privilege log if they believe such documents may fall into the wrong hands or may be disclosed during litigation." (Defs.' Mem. at 13). It appears that there is some basis for this assertion.

For example, document 10 is a list of eighteen "known MS–13 members and close associates who are believed to be illegal aliens" which appears to have been specially prepared for ICE by the Town of Southold Police Department. It requires no great leap of faith to conclude that the Southold Police Department might be reluctant to share its intelligence information with ICE if that increased the likelihood that it would be disclosed in connection with civil litigation.

At the other end of the spectrum is document 2, which ICE indicates is a list of more than 13,000 persons with criminal records in Nassau County.[8] There is no indication that it reflects any particular effort on the part of the Nassau County Police Department to distinguish gang members or illegal aliens from other persons with criminal records. On the other hand, as in the case of the Southold Police Department, it is reasonable to assume that the Nassau County Police Department would be reluctant to share such a comprehensive list with ICE if it were to become available to non-law enforcement personnel in connection with civil litigation. Accordingly, this factor favors non-disclosure.

#### f. *Officer Safety*

Finally, the Defendants allege that release of the documents would compromise officer safety by "allowing gang members to anticipate ICE's activities." (Defs.' Mem. at 13; Torres Decl. ¶ 44). The Defendants assert that "[g]ang members who believe they are being targeted may take steps to avoid detection, arm themselves for a possible confrontation, or take other measures to sabotage the operations." (Defs.' Mem. at 13). While the information that the Plaintiffs seek admittedly would be subject to a Confidentiality Order, it is troublesome that the Plaintiffs seek detailed address information, including, in at least one instance, apartment numbers. (*See* Gordon Decl. ¶ 5). This would be essentially the same as disclosing the targets' names.

\* \* \*

8. The actual number of persons on the list is likely to be smaller since many of the names and dates of birth repeat. For example, one individu-al on page 1 of the spreadsheet appears in thirteen consecutive rows.

In sum, the four documents at issue may be of limited relevance to the Plaintiffs' case, but they hardly can be described as pivotal. Moreover, the production of the documents could conceivably have a negative impact on law enforcement, especially if such detailed information as apartment numbers or specific addresses were to be disclosed.

In these circumstances, I conclude that the information that the Plaintiffs seek with respect to document 10, which lists eighteen known MS–13 members, should be disclosed, but that the address information should be limited to the community where each person on the list lives.

With respect to documents 2, 12, and 19, which are significantly larger lists with less risk of easy identification, I conclude that the information sought by the Plaintiffs should be disclosed but that the building number should be redacted (*i.e.,* "Pearl Street," not "500 Pearl Street"). Additionally, if the Defendants are able to certify in a particular instance that a street address is sufficiently unique that its disclosure would be the same as disclosing the specific address, the Defendants may redact the street address. Finally, the Complaint Name information from these three documents, which is listed in Exhibit B to the Torres Declaration, shall also be provided in original form with no redaction of the addresses.

All of the documents turned over in redacted form pursuant to this Discovery Order clearly qualify for "Highly Confidential" protection. As a consequence, they will only be available to counsel of record, their employees, and experts needed to analyze them. (*See* Docket No. 19). Moreover, although the Confidentiality Order further provides that "student personnel" may be permitted to review the documents, I do not consider this appropriate given the nature of the information being disclosed. Accordingly, only non-student personnel employed in a full– or part-time basis by counsel of record will be permitted to review the documents.

I note that a further discovery conference is scheduled for June 30, 2009, at 11 a.m. If the documents that are the subject of this Discovery Order have not been produced by then, the Defendants' counsel should be prepared to discuss how quickly they can be made available.

III. *Conclusion*

In light of the foregoing, the Plaintiffs' motion to compel the production of documents, (Docket No. 130), is granted in part and denied in part. The Defendants further are directed to make the additional disclosures required by this Discovery Order at the earliest practicable date.

SO ORDERED.